UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ANTHONY G. DILWORTH and                        :
PATRICIA DILWORTH,

                                               :        OPINION AND ORDER

            Plaintiffs,                        :        10 Civ. 2224 (JMF) (GWG)

            -v.-                               :

                                               :

RANDY GOLDBERG, M.D., et al.,
                                               :
            Defendants.
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Anthony Dilworth ("Dilworth") and Patricia Dilworth ("Patricia") (together, "the

Dilworths" or "plaintiffs") have brought this action arising out of Dilworth's confinement in the

Westchester County Jail (the "WCJ"). They allege various federal and state claims against New

York Medical College ("NYMC"), Westchester County, the Westchester County Health Care

Corporation ("WCHCC"), and 47 individuals.[1]

In a previous ruling, certain claims alleged in plaintiffs' second amended complaint were

dismissed, including all claims against NYMC. Plaintiffs have moved this Court for leave to

amend their complaint for a third time. The County Defendants have opposed plaintiffs' motion

---

[1] The parties collectively referred to as the "County Defendants" are: (1) Westchester County,
(2) WCHCC, (3) Joseph Spano, (4) Anthony Amicucci, (5) Frederick Lantz, (6) John O'Neill,
(7) Charles Turner, (8) Gary Klivans, (9) Lloyd Malfer, (10) Robert Patrick, (11) James
Soychak, (12) Michael Birrittella, (13) Scott Driesen, (14) Danielle Kenney, (15) Richard
Maccabee, (16) Patrick Poggi, (17) Alvin Rogers, (18) Anthony SanMarco, (19) Edward
Schmidt, (20) Frederick Scholl, (21) Christopher Smith, (22) Michael Bourhill, (23) James
Feaster, (24) Shandon Folkes, (25) John Foy, (26) Ronald Freeman, (27) Tony Freeman, (28)
Patrick Garrett, (29) Hector Lopez, (30) Barry Muller, (31) Dennis Quast, (32) Edward Quinoy,
(33) Jason Santos, (34) Peter Savino, (35) Calvin Smith, (36) Tina Smith, (37) Jeremiah Tejeda,
(38) Manuel Vega, (39) Keith Wyatt, (40) Frank Foes, (41) Patricia Yancy, (42) Randy A.
Goldberg, M.D., (43) Gail Bailey-Wallace, M.D., (44) Alan Schramm, M.D., (45) Terry
Alexander, (46) Tracy James, (47) Jean Kadel, (48) Millie Phillips, and (49) June Yozzo.

to amend.  While it is not a party at this time, NYMC submitted a memorandum of law in opposition to plaintiffs' motion.  For the reasons discussed below, plaintiffs' motion to amend is granted in part and denied in part.

I.      BACKGROUND

        A.      Procedural History

        On May 22, 2009, Anthony Dilworth filed a pro se complaint regarding his treatment at the WCJ under a separate docket number.  See Complaint, filed May 22, 2009 (Docket # 2 in 09 Civ. 4810).  Dilworth retained counsel in September 2009 and voluntarily dismissed his pro se complaint under that docket on October 6, 2009.  See Voluntary Dismissal, filed Oct. 6, 2009 (Docket # 8 in 09 Civ. 4810).

        On March 15, 2010, the Dilworths filed the complaint in the instant action.  See Complaint, filed Mar. 15, 2010 (Docket # 2).  On April 2, 2010, plaintiffs amended their complaint for the first time.  See First Amended Complaint, filed Apr. 2, 2010 (Docket # 8).  On September 14, 2010, the Court granted plaintiffs leave to file a second amended complaint, see Order, filed Sept. 14, 2010 (Docket # 133), and plaintiffs filed their second amended complaint on September 17, 2010, see Second Amended Complaint, filed Sept. 17, 2010 (Docket # 134) ("2d Am. Compl.").

        The defendants moved to dismiss plaintiffs' second amended complaint.  The motions of NYMC and two other defendants were granted in their entirety, and the County Defendants' motion was granted in part and denied in part.  See Dilworth v. Goldberg, 2011 WL 4526555, at *11 (S.D.N.Y. Sept. 30, 2011).  Plaintiffs filed the instant motion to amend on January 24,

2

2012.[2]  The County Defendants opposed the motion.[3]  NYMC also submitted a memorandum of

law and affidavit in opposition to plaintiffs' motion to amend the second amended complaint.[4]

    B.    <u>Facts</u>

       The following is a summary of the allegations in the 89-page proposed third amended

complaint.  These allegations are assumed to be true for the purpose of resolving the instant

---

[2] <u>See</u> Notice of Motion, filed Jan. 24, 2012 (Docket ## 315, 316); Declaration of Michael Deem, filed Jan. 24, 2012 (Docket # 317) ("Deem Decl. 1"); Plaintiffs' Memorandum of Law in Support of Their Motion to Amend the Second Amended Complaint, filed Jan. 25, 2012 (Docket # 319).

[3] <u>See</u> County Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend the Second Amended Complaint, filed Feb. 27, 2012 (Docket # 322) ("Cnty. Mem."). Plaintiffs submitted a reply to the County's opposition.  <u>See</u> Reply Memorandum of Law in Support of Plaintiffs' Motion to File and Serve a Third Amended Complaint and in Opposition to County Defendants' Opposition, filed Mar. 16, 2012 (Docket # 323) ("Reply to Cnty."); Reply Declaration in Further Support of Plaintiffs' Motion to File and Serve a Third Amended Complaint, filed Mar. 16, 2012 (Docket # 324).  Without leave of Court, the County submitted a surreply on April 16, 2012, <u>see</u> County Defendants' Surreply Memorandum of Law in Further Opposition to Plaintiffs' Motion for Leave to Amend the Second Amended Complaint, filed Apr. 16, 2012 (Docket # 329) ("Cnty. Surreply"), to which plaintiffs responded on April 24, 2012, <u>see</u> Plaintiffs' Response to County Defendants' Surreply Memorandum of Law in Further Opposition to Plaintiffs' Motion for Leave to Amend the Second Amended Complaint, filed Apr. 24, 2012 (Docket # 330) ("Pl. Surreply"); Declaration in Support of Plaintiffs' Opposition to the County Defendants' Surreply, filed Apr. 24, 2012 (Docket # 331).

[4] <u>See</u> New York Medical College's Memorandum of Law in Opposition to Plaintiffs' Motion to Amend the Second Amended Complaint, filed Feb. 27, 2012 (Docket # 320) ("NYMC Mem."); Declaration of Sarah L. Reid, filed Feb. 27, 2012 (Docket # 321).  Plaintiffs responded to NYMC's submissions and argue that NYMC should not be heard to oppose the motion to amend because it is a "non-part[y]."  Reply Memorandum of Law in Support of Plaintiffs' Motion to File and Serve a Third Amended Complaint and in Opposition to NYMC's Opposition, filed Mar. 16, 2012 (Docket # 325) ("Reply to NYMC") at 1–2 (citation omitted); <u>see also</u> Reply Declaration in Further Support of Plaintiffs' Motion to File and Serve a Third Amended Complaint and in Opposition to NYMC's Opposition, filed Mar. 16, 2012 (Docket # 326) ("Deem Reply Decl.").  But NYMC is not a stranger to this litigation: it was named in the Second Amended Complaint, was served with process, and filed a motion to dismiss through counsel.  Although its motion to dismiss was granted, there has been no final judgment, and NYMC is entitled to be heard as to the renewed effort to include it in the proposed third amended complaint.  Moreover, plaintiffs have addressed NYMC's arguments in full.  <u>See</u> Reply to NYMC; Deem Reply Decl.

motion.

  1. <u>Initial Injuries</u>

  From October 3, 2008 through September 23, 2009, Anthony Dilworth, who is African-American, was a pretrial detainee in the WCJ.  <u>See</u> Proposed Verified Third Amended Complaint, dated Jan. 2012 (annexed as Ex. 1 to Deem Decl. 1) ("3d Am. Compl.") ¶¶ 13, 64.  On December 16, 2008, a "trustee" of the WCJ spilled liquid wax on the floor of the WCJ.  <u>Id.</u> ¶ 66(a).  No caution signs were placed in the area, <u>id.</u> ¶ 66(b), and no correctional officer was in position to warn passersby of the hazard because the officer assigned to the area had quit his post without proper authorization, <u>id.</u> ¶ 66(c).  While walking down the hallway, Dilworth slipped and fell on the wax, "suffered severe injuries to his head, back, and right arm, and lost consciousness due to the fall."  <u>Id.</u> ¶ 66(d).

  After the fall, Malfer and Birrittella "happened upon" Dilworth, who was then lying on the floor "in obvious physical distress and severe pain."  <u>Id.</u> ¶ 66(e).  Instead of calling an emergency code, "Malfer instructed other inmates to assist Mr. Dilworth to the WCJ's infirmary, in direct contravention to [Westchester County Department of Correction ("DOC")] customs, policies, and procedures."  <u>Id.</u> ¶¶ 66(g)–(h).  Klivans, Rogers, James, Kadel, Malfer, and Birrittella were in the infirmary when Dilworth arrived.  <u>Id.</u> ¶ 66(j).  James gave Dilworth a "cursory" examination, <u>id.</u> ¶ 66(l), and "deliberately understated and inaccurately documented Mr. Dilworth's actual medical condition," <u>id.</u> ¶ 66(m).  Dilworth was released from "medical care in violation of rules, regulations, and policies governing the WCJ."  <u>Id.</u> ¶ 66(m).

  Dilworth tried to return to his bed, but Rogers ordered him to attend a previously scheduled visit with Patricia and "threatened to charge him with disobeying a direct order if he did not comply."  <u>Id.</u> ¶ 66(o).  Dilworth visited with Patricia.  <u>See id.</u> ¶ 66(r).  Dilworth's injuries

were immediately apparent to Patricia, a nurse, and various correction officers.  See id. ¶¶ 66(p), (r), (s), (u), (w).  At no time, however, was a "code" called or was Dilworth provided with emergency medical care.  Id. ¶ 66(x).

After meeting with his wife, Dilworth was "brought to his bed in a wheelchair and . . . [was] left to his own devices, in direct contravention to controlling emergency medical procedures, and rules, regulations, and policies governing the WCJ."  Id. ¶ 66(y).  Rogers went to Dilworth and demanded that he sign "fraudulent paperwork," which stated that Dilworth was the cause of his own accident and which would have "effectively waiv[ed] all legal claims against Westchester County, Malfer and others."  Id. ¶ 66(z).

2.    Ensuing Events

The next day, December 17, 2008, Dilworth was visited by Klivans, Malfer, Rogers, Kenney, Williams, Alexander, James, Kadel, and Dr. Goldberg.  Id. ¶ 67(a).  Dilworth informed the group that "he could not breathe and suffered from extreme back pain."  Id. ¶ 67(c).  Dilworth was carried, placed in a wheelchair, and taken to the WCJ's medical clinic.  Id. ¶¶ 67(e)–(f).  Dilworth was unable to control his bowels and bladder, id. ¶ 67(g), and his "leg and arm shook uncontrollably," id. ¶ 67(h).  "Kadel lifted Mr. Dilworth's shirt and discovered [that] he had sustained a chemical burn from the floor wax he fell in the day prior."  Id. ¶ 67(j).  At no time was Dilworth "transported to qualified emergency medical personnel, or otherwise provided access to them."  Id. ¶ 67(i).

Dr. Goldberg examined Dilworth's back and asked Rogers to view it as well.  Id. ¶ 67(k).  Dr. Goldberg and Rogers then proceeded to have a private conversation, id. ¶ 67(l), in which a "conspiracy to deny Dilworth all federal and state rights was spawned . . . in order to cover up Malfer's and Birrittella's original misconduct," id. ¶ 67(m).  Dilworth's medical records were

falsified, see id. ¶¶ 67(p)–(r), and officers prevented him from being transported to a hospital, despite the fact that a sergeant told him that he should have been taken to one, id. ¶¶ 67(n), (t), (u), (w).  Instead, Dilworth was transported to J2 Dorm, "a non-handicap accessible housing unit," where Dilworth was left in a bed "in direct contravention to controlling emergency medical procedures, rules, regulations, and policies governing the WCJ."  Id. ¶ 67(u).  "Upon arrival at J2 Dorm the correction officer on duty stated to Rogers, James and Kadel that Mr. Dilworth should be in the hospital, and J2 Dorm was not the proper housing area for a handicapped inmate."  Id. ¶ 67(w) (internal quotation marks omitted).

### 3.   Events in J2 Dorm

From December 17, 2008 through December 22, 2008, Dilworth was denied meals on several occasions, see id. ¶¶ 68(a), 71(b); was not able to take a shower, see id. ¶¶ 68(b)–(c); and was refused pain medication, see id. ¶¶ 71(d)–(e), 105(a).  "Mr. Dilworth was made to lie in his own feces and urine for five days due to his inability to ambulate and the denial of all medical aids, including a portable urinal."  Id. ¶ 74.  Dilworth's request for a wheelchair was ignored and he was forced to walk with crutches, see id. ¶¶ 67(s), 75(e)–(f), which were eventually confiscated by Rogers, id. ¶¶ 75(a)–(b).  During this time, Dilworth was not permitted to file sick call slips or grievances.  See id. ¶¶ 67(y), 69(a)–(b), 71(a), 75(g), 79(d).  Dilworth was repeatedly told by Rogers and other correction officers that he was being denied treatment per Rogers' orders.  See id. ¶¶ 75(g)–(j), 75(r)(ii); see also id. ¶¶ 69(d), 97(h)–(n), 133(b).  Rogers threatened Dilworth and told him not to file grievances.  See id. ¶¶ 66(o), 75(g), 149(a).

Patricia made visits to the WCJ on December 23, 2008 and on December 27, 2008.  See id. ¶¶ 78(a), 83(a).  On both occasions, "she waited for an extended period of time, but [Dilworth] never came to see her."  Id. ¶¶ 78(b), 83(b).  Patricia visited the WCJ again on

December 30, 2008, and was able to visit with her husband, but when he arrived he was crying due to extreme pain and his "hand shook uncontrollably."  Id. ¶¶ 84(a)–(c).  During a subsequent visit with Patricia, Dilworth lost control of his bladder in her presence.  Id. ¶ 85(a).

While in J2 Dorm, multiple correction officers told Dilworth not to submit any more grievances or otherwise refused to accept grievances, see id. ¶¶ 79(a)–(b), 79(d), 92(b), 92(g), 100(b), and Dilworth's subsequent requests for sick call slips and grievance forms were denied, see id. ¶¶ 110(a)–(c), 117(a)–(b), 166(a)–(b); see also id. ¶ 133(b) ("Rogers also instructed Reyes-Amariles and other correction officers that if Mr. Dilworth asked for 'anything' their answer was to be 'No, just no.'").  Dilworth "subsequently made copies of his completed grievances and forwarded them to [Patricia]" who sent the grievances to the New York State Commission of Correction ("Commission").  Id. ¶¶ 80–81; see also id. ¶ 36.  Dilworth won one grievance submitted to the Commission and was informed he would be taken to the hospital, but he was not taken to the hospital.  See id. ¶¶ 92(a)–(d).

During his time in the WCJ, multiple officers offered Dilworth medical treatment, commissary items, and early release if he agreed to sign a statement waiving his potential legal claims against Westchester County and other defendants.  See id. ¶¶ 85(h), 89(d), 92(f), 100(a), 107, 118(f), 126(d).  On multiple occasions, Dilworth was instructed to waive legal claims or to not bring any actions against other officers.  See id. ¶¶ 66(z), 96.  In addition, multiple officers prevented Dilworth's fellow inmates from assisting him.  See id. ¶¶ 101, 118(a), 118(g)–(i), 135(i)–(j).  If inmates did assist Dilworth, they were punished by correction officers.  See id. ¶¶ 116(g)–(h), 118(g)–(i), 120, 135(i)–(j).

Throughout the course of his stay in J2 Dorm, Dilworth was subjected to numerous adverse actions.  Dilworth's "law library, church, education and recreation privileges" were all

revoked.  Id. ¶ 92(g); see also id. ¶¶ 115, 117(c).  His complaints of pain were consistently

ignored and medical treatment was denied, despite the fact that Dilworth's injuries were well

known.  See id. ¶¶ 90(c)–(e), 94(c), 102, 104(b), 104(i), 106, 109(c)–(e), 111, 119.  Dilworth

"was assigned to Chronic Care, and prescribed various pain medications.  However, Dr.

Goldberg stated a certain prescription would not be renewed because Mr. Dilworth was 'costing

[him] too much money.'"  Id. ¶¶ 90(a)–(b) (brackets in original).  In addition, Dilworth's

subsequent requests for pain medications were ignored.  See id. ¶¶ 91, 97(a), 99.  Instead,

Dilworth was prescribed Tylenol.  See id. ¶ 90(e).  When Dilworth told Dr. Goldberg that

Tylenol was "contraindicated for people with high blood pressure, such as himself," Dr.

Goldberg told Dilworth that if he did not take the medications prescribed, including Tylenol, he

would be disciplined.  See id. ¶¶ 90(f)–(g).

Dr. Goldberg diagnosed Dilworth as having "'tennis elbow,'" despite the fact that he had

previously informed Dilworth that his x-rays revealed that he had a "chipped bone in his right

arm, and would need surgery to straighten his arm and remove the bone chip."  Id. ¶¶ 90(c)–(d).

At some point, Dilworth discovered that he had received authorization to use a wheelchair "for

all appointments in the old jail clinic."  Id. ¶ 97(b).  However, Rogers learned of this

authorization and deleted it.  Id. ¶ 97(d).  On multiple occasions, the logbooks of the jail and

Dilworth's medical records were falsified in order to cover up the fact that Dilworth was not

receiving the services he required.  See id. ¶¶ 67(r), 92(j), 97(d), 105(b), 112(k).  Dilworth was

also prevented from obtaining a copy of his accident report.  See id. ¶¶ 88, 109(a)–(b).

On February 12, 2008, Dilworth was referred to Mental Health Services.  Id. ¶ 104(a).

On that day, Dilworth spoke with Dr. Schramm.  See id. ¶ 104(c).  NYMC employed Dr.

Schramm to provide mental health care to WCJ inmates.  Id. ¶ 23.  During the session, Dr.

Schramm was told by a person named Hines "that J2 Dorm was not the proper housing area for

Mr. Dilworth."  Id. ¶ 104(f).  Dr. Schramm told Dilworth he would look into the allegations, but

Dilworth was not transferred from J2 Dorm or taken to qualified medical personnel.  Id.

¶¶ 104(g)–(h).  "Schramm also failed to provide any mental health care to Mr. Dilworth."  Id.

¶ 104(i).

      On one occasion, Dilworth was physically examined by Dr. Goldberg and others to

determine whether he would be allowed to leave the WCJ for medical care.  See id. ¶ 111(d).

During the physical examination, Dr. Goldberg manipulated Dilworth's legs, "causing him

extraordinary pain.  Mr. Dilworth screamed in agony and pleaded for him to stop."  Id.

¶¶ 111(e)–(f).  Dr. Goldberg persisted.  Id. ¶ 111(g).  "As Goldberg pushed Mr. Dilworth's leg

towards his chest[,] Mr. Dilworth heard a pop in his lower back, and experienced the greatest

pain of his life."  Id. ¶ 111(h).  Dr. Goldberg "ignored the signs of Mr. Dilworth's physical

distress.  Id. ¶ 111(l).  "Goldberg then compelled Mr. Dilworth to attempt to walk on his heels

. . . ."  Id. ¶ 111(m).  Dilworth "attempted to comply, but fell to the floor striking his head and

back, thereby exacerbating his original injuries and suffering additional severe pain."  Id. ¶

111(p).

      At some point, Dilworth "attempted to take a shower with the assistance of the only aid

available, a plastic chair."  Id. ¶ 112(a).  The chair broke and Dilworth fell in the shower stall

"striking his face and teeth [on] the tiled floor."  Id. ¶¶ 112(b)–(c).  "As a result of the impact[,]

Mr. Dilworth suffered additional physical injuries and severe pain, including subsequent loss of

two teeth and a lacerated lip."  Id. ¶ 112(d).  Dilworth was not provided with emergency dental

care.  Id. ¶ 112(g).  "Over the course of the next three months Mr. Dilworth submitted

approximately twenty sick call slips to see a dentist, because his tooth and gum had become

infected." Id. ¶ 112(i).  "Goldberg directed Mr. Dilworth to stop submitting call slips for dental, and refused to perform an examination or prescribe an antibiotic even though puss visibly oozed from his lip and gum, emitting a putrid odor." Id. ¶ 112(j).  Dr. Goldberg falsely stated in Dilworth's medical chart that he had examined Dilworth.  Id. ¶ 112(k).  Approximately two weeks after his fall, unidentified DOC medical personnel told Dilworth that he should have been prescribed antibiotics for his infected gum and that his tooth should be pulled.  See id. ¶¶ 112(l)–(n).  However, DOC medical personnel refused to pull the tooth because it had broken off below the gum line and an extraction of the tooth would therefore be considered surgery.  See id. ¶ 112(m).  DOC medical personnel recommended to Dilworth that he have the tooth pulled once released from custody.  Id. ¶ 112(n).  The DOC medical personnel "were acting pursuant to directives, policies, customs and/or practices of Westchester County, WCHCC and/or NYMC." Id. ¶ 112(o).

On one occasion, "Patrick, Rogers and SanMarco compelled Mr. Dilworth to watch a brutal physical assault by Patrick upon inmate James Bowen who had injured his head and back when he fell out of the top bunk of a bunk bed." Id. ¶ 87(a).  Dilworth tried to leave the area and avert his eyes from the "horrific display of brutality, but SanMarco issued a 'direct order' to 'watch.'" Id. ¶ 87(i).  "As Patrick brutalized Mr. Bowen SanMarco assured Mr. Dilworth that if he 'signed' fraudulent papers and waived his legal claims[,] things would get 'easier,' Mr. Dilworth would be transferred to the hospital ward, and 'no more Rogers.'" Id. ¶ 87(j). "Goldberg, Kadel, and James were present and personally observed the entire incident, but never attempted to interfere with Patrick's repeated assaults." Id. ¶ 87(o).  "Patrick, Rogers, and SanMarco were never disciplined for their misconduct against the other detainee or Mr. Dilworth." Id. ¶ 87(x).

In February or March 2009, Dilworth asked Rogers "for permission to use the law library to obtain information regarding filing a notice of claim against Westchester County." Id. ¶ 115(a). Rogers denied Dilworth's request but told him that he would provide him with the information. Id. ¶ 115(b). "Rogers subsequently provided a boilerplate notice of claim form . . . ." Id. ¶ 115(c). However, Rogers had "altered the form by crossing out the preprinted addressee on the form and writing in a party not authorized by state law to receive Mr. Dilworth's notice of claim on behalf of Westchester County." Id. ¶ 115(d).

Rogers and other correction officers encouraged other inmates at the prison to assault Dilworth. On a number of occasions, three inmates "filled . . . balls with rice and other hard objects and repeatedly hurled them at Mr. Dilworth's head and genitals, often striking their intended target." Id. ¶ 116(c). "Mr. Dilworth reported the assaults to Maccabee, Poggi, Rogers and other correction officers on several occasions." Id. ¶ 116(d). However, the officers "refused to intervene or prevent the physical assaults." Id. ¶ 116(e). The same three inmates later beat and kicked Dilworth in the bathroom of their housing unit. Id. ¶ 116(j). One of the inmates, Thomas, told Dilworth that the beatings were "for Big Dog [Rogers]." Id. ¶ 116(k). "R. Freeman was on duty and in close enough proximity to hear Mr. Dilworth's screams for help from the bathroom, but failed to intervene in the prolonged and boisterous beating or document its occurrence." Id. ¶ 116(l).

### 4. Events in J1 Dorm

After Dilworth refused protective custody, he was transferred to J1 Dorm. See id. ¶ 118(e). Once there, he was not provided access to the law library, see id. ¶¶ 121–22, and his medical needs continued to be ignored, id. ¶ 127. Dilworth was told that there was nothing

wrong with him and that he was "'delusional'" for thinking he was injured.  Id. ¶¶ 119, 127(c).

"Garrett also arbitrarily confined Mr. Dilworth to a holding pen and forced him to stand in a

manner that caused severe pain, on several occasions.  Maintaining that position often resulted in

Mr. Dilworth losing control of his bladder and soiling his clothes."  Id. ¶¶ 129(b)–(c).  On one

occasion, "a Muslim Imam employed by the WCJ[] observed Mr. Dilworth leaving a trail of

urine in the hallway and stated to Klivans that Mr. Dilworth should be in a wheelchair, and in the

hospital."  Id. ¶ 129(d)(v).  "Klivans responded, in part, 'We're breaking him.'"  Id. ¶ 129(d)(vi).

Dilworth "attempted to return to his area to change clothes," but Garrett refused his request, and

then forced him to attend a visit with his wife.  See id. ¶¶ 129(d)(vii)–(viii).  Bourhill was present

in the hallway at this time.  Id. ¶ 129(d)(ix).  After the incident, the Dilworths complained to

Soychak and other correctional officers about Dilworth's medical condition and the fact that he

could not control his bladder.  Id. ¶¶ 129(d)(x)–(xi).  "Soychak replied, 'Don't drink water.'"  Id.

¶ 129(d)(xii).

On numerous occasions, Dilworth was threatened with physical violence by correctional

officers.  See, e.g., id. ¶¶ 129(d)(vi), 130(a)–(b), 130(e)–(f), 132(e), 153(e), 176(b), 188; see also

id. ¶ 149(a) (threatening the lives of Dilworth's children).  Dilworth was also the target of racial

slurs by multiple correctional officers.  See, e.g., id. ¶¶ 132(c)–(f), 143(a), 153(d), 158(h), 184.

Indeed, on one occasion, after threatening to "break" Dilworth, instructing Dilworth to "[s]it

[his] black ass down," and calling Dilworth a "nigger," Santos revealed a tattoo on his shoulder

to Dilworth.  Id. ¶¶ 153(d)–(e).  The tattoo depicted a scene in which three babies of different

ethnicities – "'Jews,' 'Niggers,' and 'Chinks'" – hung by their necks from nooses.  Id. ¶ 153(e).

Santos informed Dilworth, "'This is what we do[,]' as he simulated grabbing the rope with his

hand and hanging the ethnicities represented by the babies."  Id.  Dilworth submitted a grievance

regarding Santos's demonstration of his tattoo to Dilworth, but "Santos informed Mr. Dilworth that nothing would come of his grievance."  Id. ¶ 153(f).  Another sergeant informed Dilworth that, with respect to Santos's tattoo and his explanation thereof, "Santos has a right of expression and nothing could be done about it."  Id. ¶ 153(g).

On January 8, 2009, Dilworth "was scheduled to see the optometrist due to his blurred vision, which had begun after his slip and fall."  Id. ¶ 95(a).  Dilworth was seen by Dr. Bailey-Wallace, who "intentionally or recklessly misdiagnosed Mr. Dilworth with poor vision and in need of glasses, as justification for denying him medical care for his severe head injury."  Id. ¶ 95(c).  In February 2009, Kadel informed Dilworth that a medical report indicated that Dilworth had "'chronic nerve damage;' [t]hat the nerve damage was due to Mr. Dilworth's 'head injury;' [t]he nerve damage was most likely the cause of his blurry vision, uncontrollable shaking and incontinence; and [t]hat he probably suffered from a 'pinched nerve' in his spine." Id. ¶ 106(a).

"While housed in J Dorm[,] Mr. Dilworth completed and submitted several commissary orders.  Most of these orders were never filled."  Id. ¶¶ 135(a)–(b).  Dilworth was incorrectly told that his orders were not being filled because "he did not have sufficient funds in his account."  Id. ¶ 135(c).  "Around January 2009[,] Mr. Dilworth informed Rogers that he was not receiving the items that he ordered from the commissary."  Id. ¶ 89(a).  Rogers, who "is responsible for the processing of inmate[s'] commissary purchase orders," id. ¶ 89(g), told Dilworth "that he would not get any commissary privileges because Mr. Dilworth did not know 'how to keep [his] mouth shut,'" id. ¶ 89(b) (alteration in original), and offered to provide him with commissary privileges "if he signed a fraudulent document waiving his legal claims against Westchester County and other defendants," id. ¶ 89(d), but Dilworth refused, id. ¶ 89(e).

13

"Various correction officers informed Mr. Dilworth that Rogers was responsible for the interference with his commissary privileges." Id. ¶ 135(d).  Dilworth "brought this to the attention of Driesen, Kenney, Laughlin, Poggi, SanMarco, C. Smith, and several other correction officers," id. ¶ 135(e), although his complaints were never investigated and his commissary orders "continued to be interfered with," id. ¶¶ 135(f)–(g).

     5.    Events in A-Block

Eventually, Dilworth "was reassigned to A Block for the purpose of being housed in a handicap accessible cell and housing area." Id. ¶ 137(a).  "The following day, Goldberg threatened to stop Mr. Dilworth's pain medications unless he identified the person responsible for assigning him to a handicap cell." Id. ¶ 137(b).  While in A-Block, Dilworth did not receive his pain medication, was not provided meals on a regular basis, and was not assigned an aide to assist him with daily necessities. See id. ¶ 138(a).  "In about May 2009, Goldberg arbitrarily discontinued Mr. Dilworth's pain medication." Id. ¶ 139.  Dilworth was not allowed to file grievances and was told by various correction officers that the officers had been directed by their "supervisors and senior correction officers to not accept any grievances from Mr. Dilworth." Id. ¶¶ 138(b)–(c).  "Garrett routinely interfered with Mr. Dilworth's visits, and intentionally inflicted physical, psychological and emotional pain upon him by requiring Mr. Dilworth to stand in a manner that knowingly caused him severe pain." Id. ¶ 150(a).

Dilworth endured various retaliatory acts as a result of the actions he initiated against defendants.  As retaliation for the original pro se action Dilworth initiated, "Rogers directed continuous lighting of Mr. Dilworth's cell," id. ¶ 140(a), and made threats against the lives of the Dilworths' children, id. ¶ 149(a); see also id. ¶ 154 ("While housed in A Block, on information and belief, Rogers ordered all newly hired correction officers to arbitrarily search Mr. Dilworth

because he was likely to be carrying contraband, when in fact he was not.").  While Dilworth

resided in A-Block, "Garrett routinely interfered with Mr. Dilworth's visits, and intentionally

inflicted physical, psychological and emotional pain upon him by requiring Mr. Dilworth to

stand in a manner that knowingly caused him severe pain."  Id. ¶ 150(a).  Garrett ignored

Dilworth's pleas that Garrett was causing him pain.  Id. ¶¶ 150(b)–(c).  Smiley, a member of the

Special Investigation Unit, told Dilworth "that the reason he was being tortured was because of

his federal lawsuit."  Id. ¶ 150(f).

"On May 15, 2009, Mr. Dilworth was transferred to a handicap accessible cell."  Id.

¶ 146.  Starting on May 21, 2009, Dilworth "was confined to his cell for forty-one days due to

fabricated disciplinary charges filed" against him.  Id. ¶ 147.

While housed in A-Block, Dilworth submitted 50 grievances to Rogers, Kenney, Poggi,

and other correctional officers regarding his unfilled commissary orders.  See id. ¶ 152(a).

These grievances were never investigated.  See id. ¶ 152(b).  "Donna Blackmon, a supervisor of

Aramark, verified that Mr. Dilworth's funds had been improperly removed from his account"

and that "she never received any paperwork from Rogers, Kenney, Poggi, or any other correction

officer or supervisor regarding Mr. Dilworth's complaints."  Id. ¶¶ 156(a)–(b).  On June 12,

2009, Blackmon discovered "that several of Mr. Dilworth's orders from Aramark were

improperly placed in a storage room."  Id. ¶ 157(a).  Blackmon also told Dilworth that another

inmate who had a pending legal claim against Westchester County "[w]as also experiencing

interference with his commissary privileges."  Id. ¶ 157(c).  A correctional officer was present

when Dilworth spoke with Blackmon and stated, "'What do you expect . . . you're suing the

County.'"  Id. ¶ 157(b) (ellipsis in original).

While Dilworth was housed in A-Block, "Schramm conducted a physical examination of Mr. Dilworth," id. ¶ 145(a), in which he reviewed Dilworth's "medical chart and original pain medications, which had since been stopped by Dr. Goldberg," id. ¶ 145(b). "Mr. Dilworth again informed Schramm of the torturous treatment he was suffering." Id. ¶ 145(c). Nevertheless, Dilworth "continued to be denied medical or mental health care for his severe injuries and emotional trauma." Id. ¶ 145(d).

On June 13, 2009, "Rogers, Wyatt, and Tejeda entered Mr. Dilworth's cell and demanded that he surrender the legal papers he received from the Pro Se Clerk." Id. ¶ 158(a). When Dilworth refused, Rogers "ordered Wyatt and Tejeda to conduct an illegal strip search of Mr. Dilworth." Id. ¶ 158(c). During this search, Dilworth was forced to "strip completely naked in full view of the entire housing area." Id. ¶ 158(d). Rogers then "taunted and mocked Mr. Dilworth because of his injuries and medical condition, including his impotence." Id. Rogers then ordered "Tejeda and Wyatt to destroy and/or confiscate all [of Dilworth's] personal belongings, including all papers regarding his federal lawsuit, a Bible, prayer books, and family pictures." Id. ¶ 158(f). "After reading Mr. Dilworth's legal papers Rogers stated . . . 'Fuck the Pro Se Clerk. This is Westchester. Nigger World.'" Id. ¶ 158(h). Tejeda and Rogers then inflicted severe pain on Dilworth by performing "an illegal hand technique" on him. Id. ¶¶ 158(i)–(k). Dilworth's legal papers and personal belongings were never returned. See id. ¶¶ 158(l)–(n). On June 15, 2009, Rogers ordered SanMarco and Wyatt to conduct an additional search of Dilworth's cell. Id. ¶¶ 159(a)–(b). During this search they confiscated Dilworth's "writing material, extra towels, sheets, and blankets which were approved by medical personnel." Id. ¶ 159(c). Following these initial searches, Dilworth's cell was searched "every week, about three times a week." Id. ¶ 160(a).

16

A second strip search was conducted at the end of June 2009.  Id. ¶¶ 161(b)–(g).  Again, Dilworth was forced to strip naked in full view of the housing area.  Id. ¶ 161(c).  During the course of the search Dilworth "informed Rogers that he was suffering severe pain in his back." Id. ¶ 161(e).  "Rogers stated he didn't 'give a fuck.'"  Id. ¶ 161(f).  Rogers asked Dilworth if he wanted to "waive his legal claims against Westchester County and other defendants."  Id. ¶ 161(g).  Rogers then ordered Tejeda to remove one of the mattresses that had been prescribed to Dilworth to treat Dilworth's injuries.  See id. ¶¶ 161(h)–(j).

On August 11, 2009, the Dilworths "personally informed Spano of Mr. Dilworth's severe injuries[,] . . . the torture he was suffering at the hands of Goldberg, Rogers, and others," and that correction officers were eavesdropping on their visits.  Id. ¶¶ 162(a), (c).  "Spano turned to Soychak and asked if their statements were true.  Soychak affirmatively misrepresented that it was the first time he had heard about [the Dilworths'] complaints."  Id. ¶¶ 162(d)–(e).  However, nothing changed for Dilworth.  See id. ¶ 162(f).  Correction officers continued to make extortionary threats, see id. ¶ 162(g); Dilworth's mail was tempered with, see id. ¶ 163(a)(i); his cell was continuously searched and the searches increased in severity and frequency, see id. ¶¶ 163(a)(v), (d); his personal belongings and legal papers were confiscated, see id. ¶¶ 163(a)(vi); and he was still prevented from placing commissary orders because of inaccuracies in his financial account, see id. ¶ 163(a)(ii).  Dilworth discussed these occurrences with Lantz, who in turn told Amicucci and Spano.  See id. ¶¶ 163(a)–(b), (e).

On September 1, 2009, Dr. Goldberg told Dilworth that he would like to "serve as Mr. Dilworth's treating physician through his private practice upon Mr. Dilworth's release from the WCJ."  Id. ¶ 164(d).  At that time, Dr. Goldberg disclosed the following information to Dilworth: (1) the medication Dilworth was receiving in the WCJ for his back "was 'not doing

anything' for him"; (2) Dilworth had a chipped bone in his elbow; (3) Goldberg could not discuss many aspects of Dilworth's health; (4) the shaking in Dilworth's hands was due to nerve damage and idleness and that it might subside with proper treatment; (5) Dilworth's impotence was caused by the slip and fall in the WCJ; (6) Dilworth "suffered a crack in his #2 vertebrae and it was leaking fluid," and his "#4 and #5 vertebrae likely needed to be fused"; (7) "[b]udgetary matters prevented [Dilworth] from receiving 'all the care he needed' while in custody," and for "financial reasons," he would receive either a CT scan or an MRI, but not both; and (8) he needed a CT scan.  Id. ¶¶ 164(e)–(n), (p).  Dr. Goldberg later "refused to accept" Dilworth's evaluation of his level of pain as a ten on a scale of one to ten, "stating 'Come on. You gotta have soul, like James Brown.'"  Id. ¶ 175.

On September 11, 2009, Dilworth retained counsel, who provided him with a copy of an "engagement letter and other legal documents."  Id. ¶ 168(a).  After conferring with counsel, Dilworth was stopped by Watson and Tejeda.  Id. ¶ 168(b)(i).  They conducted a full body search of Dilworth.  Id.  They told Dilworth that they were doing the search because they had "received a call from a DOC employee in the 'main office.'"  Id. ¶ 168(b)(ii).  "Spano's office is referred to as the main office.'"  Id. ¶ 168(b)(iii).  Following the search, Dilworth's legal documents were forwarded to Spano's office.  Id. ¶ 168(d).  On the way back to his cell, Dilworth was stopped by Garrett, who arbitrarily confined Dilworth to a holding cell, confiscated his crutches, and forced him to stand for 45 minutes.  Id. ¶¶ 168(e)(i)–(iii).  Garrett also denied Dilworth his pain medication.  See id. ¶¶ 168(f)–(g), (m).  When Dilworth asked to speak to a sergeant, "Garrett replied, 'Take your black ass and go lock in.'"  Id. ¶¶ 168(h)–(i).

Throughout the course of his stay in A-Block, Dilworth was subjected to various adverse actions.  He was denied pain medication and haircuts, id. ¶¶ 168(m), 169(e), 170(a); he was

arbitrarily confined to his cell, id. ¶¶ 165, 169(a), 169(c), 170(d), 171(a); visits with Patricia and his attorney were shortened by correction officers, id. ¶¶ 169(b), 169(d), 171(b); he received smaller portions of food as a result of Dr. Goldberg's arbitrarily assigning him "diet trays," see id. ¶ 173(a); and his crutches were confiscated numerous times, see id. ¶¶ 170(e), (i).  His food was also tampered with, id. ¶ 173(b), and he was forced to stand without the aide of his crutches for periods of up thirty minutes, see id. ¶¶ 170(b), (g).  Dilworth continuously attempted to file grievances, but they were either denied or ignored, see id. ¶¶ 172(a)–(c), 174(a), or Dilworth was prevented from obtaining the required forms, see id. ¶ 166.  "When Mr. Dilworth asked [why] he was being treated so poorly[,] Santos replied he was following 'orders' . . . ." Id. ¶ 169(f).

From December 16, 2008 through September 23, 2009, Dilworth "submitted at least ten sick call slips specifically seeking medical care for incontinence" and spoke to Dr. Goldberg on three separate occasions regarding his incontinence.  Id. ¶¶ 178(a)–(b).  On each occasion, "Goldberg made handwritten notes in Mr. Dilworth's file" regarding his incontinence and stamped the file.  Id. ¶¶ 178(c)–(d).

"From December 22, 2008 through September 23, 2009 Rogers arbitrarily confiscated four Bibles, approximately six 'Daily Breads' (prayer books), and approximately six 'Daily Words' (prayer books) from Mr. Dilworth, denying him the ability to read same which is central to his faith." Id. ¶ 76.  Dilworth's family pictures, personal diary, writing materials, legal materials, and other personal items were also taken.  Id. ¶¶ 75(h), 116(a), 123, 160(a), 161(b).  Rogers told Dilworth that the confiscated items were "'contraband.'"  Id. ¶¶ 75(i), 116(a), 125(e).  While Dilworth resided in J2 Dorm, "Foy repeatedly prevented Mr. Dilworth from attending Sunday church services."  Id. ¶ 108.  In addition, Rogers and other officers confiscated items that had been prescribed to Dilworth, such as crutches, extra mattresses, sneakers, and

portable urinals.  See id. ¶¶ 113(b), 114(c), 125(e), 129(a), 159(c), 161(h)–(j).  Dr. Goldberg told

Dilworth that he knew Rogers was confiscating items that he had prescribed, id. ¶ 161(j), and

that he would talk to Rogers about the repeated confiscation of Dilworth's urinals and extra

mattresses, but Rogers continued to confiscate these items, see id. ¶ 113(b).  Dr. Goldberg knew

Rogers was denying Dilworth the use of sneakers, but did not stop Rogers.  See id.

¶¶ 164(a)–(b).  Instead, Rogers directed James and Kadel to delete from the computer "an entry

authorizing [Dilworth] the use of his sneakers."  Id. ¶ 164(b).

From January 21, 2009 through September 2009, Rogers, Quinoy, and various unknown

correction officers fabricated and submitted approximately 20 disciplinary charges against

Dilworth.  Id. ¶¶ 97(e)–(n), 98, 132(f), 142, 143(b).  "The majority of the charges were dismissed

by the hearing officer."  Id. ¶ 98(b).

6.    Release from the WCJ

On September 23, 2009, Dilworth was released from custody.  Id. ¶ 176(f).  While

Dilworth was waiting to be transported to the Westchester County Courthouse, Rogers

"threatened him with physical bodily harm, due in part to his race, stating[,] 'You[r] black ass

better not come back.'"  Id. ¶¶ 176(a)–(b).  Correction officers read and made copies of

Dilworth's legal documents and "placed all of Mr. Dilworth's personal belongings and legal

papers into plastic bags and contaminated them with personal hygiene products."  Id.

¶¶ 176(d)–(e).

After Dilworth's release from prison, the Dilworths "attempted to resume natural marital

relations, but were unable to do so because of Mr. Dilworth's impotence and physical injuries he

suffered while detained in the WCJ."  Id. ¶ 179.  "On or about September 25, 2009, Mr. Dilworth

was evaluated by the Westchester County Department of Social Services and found to be

permanently, totally disabled due to the injuries he sustained while detained in the WCJ." Id.
¶ 180. Dilworth then sought medical care at WCHCC. Id. ¶ 181(a). The WCHCC medical staff
"consulted with Goldberg regarding Mr. Dilworth's medical history," but Dr. Goldberg
"affirmatively misrepresented to WCHCC medical personnel that Mr. Dilworth had 'no
documentation of incontinence.'" Id. ¶¶ 181(b)–(c).

After Dilworth filed the complaint in the instant action on March 15, 2010, "Westchester
County began to conduct an investigation into the allegations contained in the complaint and
interviewed various employees at the WCJ." Id. ¶¶ 182–83. On April 7, 2010, Bourhill hung
on the front door of the Dilworths' home a "DOC prison uniform containing several writings and
markings including the plaintiffs' last name, 'nigger,' [and] 'we no [sic] wear [sic] you live so
shut your mouth.'" Id. ¶ 184 (brackets omitted). "Several weeks" later, and before Dilworth had
incorporated a description of the incident into a pleading, Tejeda said to Dilworth, "I heard
someone left something for you at the house." Id. ¶ 185. "Tejeda was one of Bourhill's
accomplices/co-conspirators in placing said DOC uniform on plaintiffs' fron[t] door." Id. ¶ 186.

On August 30, 2010, Dilworth entered into the J&J Ossining Service Station and found
Garrett and Bourhill, employees of the station, present. Id. ¶¶ 187(a)–(b). "Garrett observed Mr.
Dilworth at a distance and warned Bourhill of Mr. Dilworth's presence." Id. ¶ 187(c). Bourhill
immediately left the service station, see id. ¶ 187(d), while Garrett repeatedly yelled, "'Dilworth,
get your black ass out of here,'" id. ¶ 187(e).

On December 28, 2011, SanMarco was present at the office of Dilworth's treating
physician when Dilworth appeared for an appointment. Id. ¶ 188. SanMarco "glared at Mr.
Dilworth and motioned with his hands as if he was putting on a pair of leather gloves, just as
other correction officers did prior to using physical force on inmates in the WCJ." Id. The

purpose of this action was "to convey a threat of physical harm to Mr. Dilworth and Mr. Dilworth interpreted said actions as such, causing severe emotional trauma."  Id.

    C.    <u>Department of Justice Investigation</u>

    The United States Department of Justice ("DOJ") conducted an on-site inspection of the WCJ from February 25 to 28, 2008.  Id. ¶ 50.  DOJ notified WCJ officials and legal counsel for Westchester County of its preliminary findings, which were subsequently conveyed to "policy level officials" of Westchester County and NYMC.  Id. ¶¶ 50, 52.  The preliminary findings were substantively identical to those contained in DOJ's findings letter, dated November 19, 2009, id. ¶ 51, which provides in part:

> We found that WCJ has a pattern of failing to: (1) adequately protect inmates from harm and serious risk of harm from staff; and (2) provide inmates with adequate medical and mental health care. These deficiencies violate WCJ inmates' constitutional rights.

> We found evidence of a pattern and practice of use of excessive force by the Emergency Response Team ("ERT").

> We found that WCJ inadequately reviews use of force incidents to prevent a pattern of use of excessive force against inmates.

> We find that WCJ fails to adequately document uses of force in its written reports, and thus fails to adequately protect inmates from harm.

> WCJ fails to maintain an adequate detainee grievance system, further contributing to the problems of monitoring and investigation of use of force incidents.

> WCJ fails to adequately discipline officers for using excessive force against inmates. . . . In our investigation, we found that WCJ fails to initiate disciplinary measures to correct officers who use excessive force.

> [T]here are some areas where the medical care provided at WCJ falls below the constitutionally required standards of care. Specifically, we found the following deficiencies: . . . an inadequate medical grievance process.

> WCJ['s] policy for submitting grievances . . . is not consistently implemented or effectively publicized. According to the Grievance Mechanism, CHS-A-11,

inmate complaints must be written on an inmate Grievance Form and submitted to WCJ staff. During our on-site visit, however, many of the corrections officers in WCJ's housing units did not have Grievance Forms available for inmates if requested. Further, when inmates and jail staff were asked where an inmate could get a form to file a grievance, both the inmates and jail staff provided inconsistent responses.

Id. ¶ 54 (ellipses and bracketing in 3d Am. Compl.) (citations omitted).  The DOJ's findings letter recommended that the WCJ undertake certain remedial actions "[i]n order to address the constitutional deficiencies identified above and protect the constitutional rights of detainees."[5]

_____

[5] The findings letter recommended the WCJ undertake the following:

Develop and maintain comprehensive policies and procedures, consistent with current legal standards, regarding permissible use of force. Such policies and procedure should specifically include, inter alia, the following: (i) Definitions of force and excessive or unnecessary force. (iv) Prohibition on the use of force as punishment.

Establish effective oversight of the use of force.

Develop an effective and comprehensive training program in the appropriate use of force.

Develop and implement policies, procedures, and practices to ensure inmates have access to an adequate grievance process that ensures that grievances are processed and legitimate grievances addressed and remedied in a timely manner, responses are documented and communicated to inmates, inmates need not confront staff prior to filing grievances about them, and inmates may file grievances confidentially.

Ensure that grievance forms are available on all units.

Ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, referred for investigation.

Ensure inmates have adequate access to health care.

Ensure that the medical request process for inmates is adequate and provides inmates with adequate access to medical care. This process should include logging, tracking, and timely responses by medical staff.

Id.  "[T]he medical and mental health care which DOJ found to be constitutionally inadequate was provided by WCHCC, NYMC, Bailey, Goldberg and/or Schramm."  Id. ¶ 55.

"Westchester County, WCHCC, NYMC, Bailey, Goldberg and/or Schramm provided the same level of care to inmates in the WCJ from January 1, 2006 through September 23, 2009." Id. ¶ 56.  "NYMC and/or WCHCC created and were responsible for supervising the medical request process and CHS-A-11, from at least January 1, 2006 through September 23, 2009."  Id. ¶ 57.  "At all times relevant, Westchester County, WCHCC and NYMC failed to train or supervise its employees or agents in how to respond to the grossly negligent, reckless and/or intentional infliction of pain and deliberate indifference to serious medical, dental and mental health needs of inmates in the WCJ, by DOC employees or agents."  Id. ¶ 59.

D.     Relationship of NYMC and NYMC Physicians to the WCJ

NYMC is a "private medical school in Valhalla, New York, organized as a domestic not-for-profit corporation duly existing by reason of and pursuant to the laws of the State of New York."  Id. ¶ 17.  "[S]ince at least 2004, WCHCC and NYMC have had a written Affiliation Agreement whereby each would, inter alia, use and enjoy the services and/or facilities of the other in attaining common goals, including the provision of medical care to inmates in the WCJ."  Id. ¶ 25.  WCHCC is alleged to have been "authorized to act as NYMC's agent for the purpose of entering into contracts with Westchester County for the provision of medical care to inmates in the WCJ.  Id. ¶ 26.  Westchester County had entered into several contracts with WCHCC "for the provision of medical, dental and mental health care to inmates in the WCJ."

_____

[DOJ] also would be willing to send our consultants' evaluations under separate cover.

3d Am. Compl. ¶ 54 (bracketing in 3d Am. Compl.) (citations omitted).

Id. ¶ 27.  "At all times relevant, said contracts required . . . that physician services shall be

provided 'under the Affiliation between WCHCC and New York Medical College.'"  Id. ¶ 28(a).

"[A]t all times relevant NYMC controlled which physicians provided medical, dental and mental

health care to inmates in the WCJ," id. ¶ 30, and "was responsible for the medical training or

education of Bailey, Goldberg and Schramm," id. ¶ 31.  This contract "required that all medical,

dental and mental health care provided to inmates in the WCJ meet minimal constitutional and

statutory standards of care."  Id. ¶ 32.

Drs. Bailey-Wallace, Goldberg, and Schramm are employed by NYMC to provide

medical or mental health care to WCJ inmates.  Id. ¶¶ 21–23.  Dr. Bailey-Wallace also

supervises Dr. Goldberg in his provision of medical care to WCJ inmates.  Id. ¶ 22.  Drs. Bailey-

Wallace, Goldberg, and Schramm are sued individually and as state actors.  Id. ¶¶ 21–23.

## II.   LEGAL STANDARD GOVERNING MOTIONS TO AMEND

Federal Rule of Civil Procedure 15(a)(2) instructs courts to "freely give leave [to amend

a complaint] when justice so requires."  Accord Foman v. Davis, 371 U.S. 178, 182 (1962).

Nonetheless, leave to amend may be denied where there is "undue delay, bad faith, . . . undue

prejudice to the opposing party . . . , [or] futility of amendment."  Id.; accord Jin v. Metro. Life

Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002).  Notably, "[d]elay alone . . . does not usually warrant

denial of leave to amend."  Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234–35 (2d

Cir. 1995); accord Ispat Inland, Inc. v. Kemper Envtl., Ltd., 2007 WL 2197837, at *1 (S.D.N.Y.

July 31, 2007).

"An amendment to a pleading is futile if the proposed claim could not withstand a motion

to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."  Lucente v. Int'l Bus. Machs. Corp., 310 F.3d

243, 258 (2d Cir. 2002) (citing Dougherty v. N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83,

88 (2d Cir. 2002)).  Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to dismiss an opposing party's pleading that "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  While a court must accept as true all of the allegations contained in a complaint, that principle does not apply to legal conclusions.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (citation, internal quotation marks, and brackets omitted).  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678 (citation omitted), and thus a court's first task is to disregard any conclusory statements in a complaint, id. at 680.

Next, a court must determine if the complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face."  Id. at 678 (citation and internal quotation marks omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("[A] complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion.").  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (citations and internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "'show[n] that the pleader is entitled to

26

relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (internal punctuation omitted).

III.    CLAIMS AGAINST NYMC

Plaintiffs' proposed TAC asserts four causes of action against NYMC: (1) a claim under 42 U.S.C. § 1983 brought pursuant to Monell v. Department of Social Services of New York, 436 U.S. 658 (1978), see 3d Am. Compl. ¶¶ 229–35; (2) a claim of respondeat superior liability, see id. ¶¶ 251–52; (3) a claim for breach of contract, see id. ¶¶ 253–54; and (4) a claim identified as "negligence, medical negligence and gross negligence, and intentional and negligent infliction of emotional distress," id. ¶¶ 244–50 (quoting title of Count XV).  The district court previously dismissed the Monell and respondeat superior claims that plaintiffs had asserted in their second amended complaint.  See Dilworth, 2011 WL 4526555, at *11.  NYMC contends that all of the amendments plaintiffs seek to make are futile because they fail to state cognizable claims against NYMC.  See NYMC Mem. at 1.

A.      The *Monell* Claim

The only federal claim alleged against NYMC in the proposed third amended complaint is a § 1983 Monell claim.  See 3d Am. Compl. ¶¶ 229–35.  NYMC argues that this claim cannot survive a motion to dismiss because the allegations in the proposed third amended complaint fail to cure the deficiencies this Court previously identified in the Monell claim that plaintiffs asserted against NYMC in the second amended complaint.  See NYMC Mem. at 5–8.

1.      Governing Principles

To state a claim under § 1983, plaintiffs must show that Dilworth was denied a constitutional or federal statutory right and that the deprivation of that right occurred under color of state law.  See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988).  Section 1983 does not grant any substantive rights but rather "provides only a procedure for redress for the

deprivation of rights established elsewhere," such as in the Constitution or a federal statute.

Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted), cert. denied, 512 U.S. 1240

(1994).  In its memorandum of law, NYMC does not dispute that it was acting under color of

law.

   In Monell, the Supreme Court held that municipalities may be sued under § 1983 "where

. . . the action that is alleged to be unconstitutional implements or executes a policy statement,

ordinance, regulation, or decision officially adopted and promulgated by [the municipality's]

officers."  Monell, 436 U.S. at 690.  "Although the Supreme Court's interpretation of § 1983 in

Monell applied to municipal governments and not to private entities acting under color of state

law, caselaw . . . has extended the Monell doctrine to private § 1983 defendants" acting under

color of state law.  Dubbs v. Head Start, Inc., 336 F.3d 1194, 1216 (10th Cir. 2003) (citations

omitted), cert. denied, 540 U.S. 1179 (2004); see Rojas v. Alexander's Dep't Store, 924 F.2d

406, 408–09 (2d Cir. 1990) (citing cases), cert. denied, 502 U.S. 809 (1991).  Nonetheless, as is

true for municipal defendants, "[p]rivate employers are not [vicariously] liable under § 1983 for

the constitutional torts of their employees."  Rojas, 924 F.2d at 408–09 (citing cases); accord

Whalen v. Allers, 302 F. Supp. 2d 194, 202–03 (S.D.N.Y. 2003) (private employer cannot be

held vicariously liable under § 1983 because "'there is no tenable reason[] to distinguish a

private employer from a municipality'") (quoting Temple v. Albert, 719 F. Supp. 265, 268

(S.D.N.Y. 1989)).  Rather, to state a § 1983 claim against a private entity, a plaintiff must allege

that an action pursuant to some official policy caused the constitutional deprivation.  Rojas, 924

F.2d at 408–09 (citations omitted); Jouthe v. City of New York, 2009 WL 701110, at *18

(E.D.N.Y. Mar. 10, 2009) (citation omitted); Fisk v. Letterman, 401 F. Supp. 2d 362, 375

(S.D.N.Y. 2005) (citation omitted).  In addition, a plaintiff must show that the entity was acting

under color of state law.  Rojas, 924 F.2d at 408.

> To establish the existence of a policy, the plaintiff must allege one of the following:
>
> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a 'custom or usage' and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

Jones v. Westchester Cnty. Dep't of Corr. Med. Dep't, 557 F. Supp. 2d 408, 417 (S.D.N.Y.

2008) (citations and quotation marks omitted); accord Dilworth, 2011 WL 4526555, at *9.

### 2. Pertinent Allegations

Plaintiffs' proposed third amended complaint alleges that from January 2006 to

September 2009 NYMC "controlled which physicians provided medical, dental and mental

health care to inmates in the WCJ, including Bailey, Goldberg and Schramm," 3d Am. Compl.

¶ 30, and "was responsible for the medical training or education of Bailey, Goldberg and

Schramm, with respect to the medical and mental health care they provided to inmates in the

WCJ," id. ¶ 31.  Additionally, in 2007 "policy level officials" of NYMC had discussions with

"policy level officials" of Westchester County regarding the allegations contained in the

complaint filed in March 2007 in the case Jones v. Westchester County Department of

Corrections Medical Department, 07 Civ. 3019 (CM) (S.D.N.Y.), which included an allegation

that a Westchester County official stated that the plaintiff in Jones was improperly refused

surgery "for the sole purpose of shifting the cost of his care to another institution."  3d Am.

Compl. ¶¶ 46, 47.  Also, as of March 31, 2008, "policy level officials" at Westchester County

had discussed with NYMC the preliminary findings and on-site recommendations that DOJ

rendered following its inspection of the WCJ from February 25–28, 2008. Id. ¶¶ 51–53. The DOJ's preliminary findings were substantially identical to those contained in the DOJ's findings letter, dated November 19, 2009. Id. ¶ 51.

Plaintiffs allege that "the medical and mental health care which DOJ found to be constitutionally inadequate was provided by WCHCC, NYMC, Bailey, Goldberg and/or Schramm." Id. ¶ 55. "Westchester County, WCHCC, NYMC, Bailey, Goldberg and/or Schramm provided the same level of care to inmates in the WCJ from January 1, 2006 through September 23, 2009." Id. ¶ 56. "NYMC and/or WCHCC created and were responsible for supervising the medical request process and [the grievance mechanism] CHS-A-11, from at least January 1, 2006 through September 23, 2009." Id. ¶ 57; see also id. ¶ 54 (indicating that CHS-A-11 is a grievance mechanism). Plaintiffs allege that "[a]t all times relevant, Westchester County, WCHCC and NYMC failed to train or supervise [their] employees or agents in how to respond to the grossly negligent, reckless and/or intentional infliction of pain and deliberate indifference to serious medical, dental and mental health needs of inmates in the WCJ, by DOC employees or agents." Id. ¶ 59. Furthermore, Dilworth's injuries "were so severe that even a layman could determine Mr. Dilworth had a serious medical need." Reply to NYMC at 4–5 (citing 3d Am. Compl. ¶ 129(d)(v) (statement of an imam to a WCJ correctional officer that Dilworth should be in wheelchair and in the hospital)).

　　　　　　　3.　　　Analysis

Plaintiffs contend that the foregoing allegations satisfy the second, third, and fourth methods of establishing a "policy" under the Second Circuit's Monell analysis. See Pl. Reply to NYMC at 2. But these allegations do not cure the deficiencies in the claims plaintiffs asserted in the second amended complaint against NYMC.

Plaintiffs' allegations do not satisfy the second method of establishing an official policy because none of the facts indicate that any of the persons employed by NYMC who committed allegedly unconstitutional acts are final policymakers of NYMC.  To show <u>Monell</u> municipal liability, it is not enough that there be an individual from the municipality who implemented the allegedly unconstitutional "policy."  Rather, the challenged action must have been undertaken by an authorized "final policymaker." <u>See</u> <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 123 (1988) ("[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability.") (citation omitted); <u>Capasso v. Metro. Transp. Auth. of N.Y.</u>, 198 F. Supp. 2d 452, 464 (S.D.N.Y. 2002) ("[T]he court must ask whether the governmental official is a final policymaker for the local government in a particular area, or on the particular issue involved in the action.") (citation omitted).  The proposed third complaint, however, alleges only that Drs. Bailey-Wallace, Goldberg, and Schramm were to provide medical care to WCJ inmates and that Dr. Bailey-Wallace would supervise Dr. Goldberg's work. 3d Am. Compl. ¶¶ 21–23. Nothing in these allegations suggest that these doctors were final policymakers of NYMC or that their actions constituted official NYMC policy.

A plaintiff may satisfy the third method of establishing an official policy – imputing constructive knowledge to policymakers of unconstitutional actions where those acts are persistent and pervasive – by demonstrating "that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." <u>Amnesty Am. v. Town of West Hartford</u>, 361 F.3d 113, 126 (2d Cir. 2004) (citation omitted).  In other words, a § 1983 plaintiff "may establish the pertinent custom or policy by showing that the [entity], alerted to the [unconstitutional action by its employees], exhibited deliberate indifference." <u>Vann v. City of New York</u>, 72 F.3d 1040, 1049 (2d Cir. 1995) (citation omitted).

To establish such deliberate indifference, a plaintiff must show that the necessity for additional action to protect against constitutional violations was "obvious."  Id. (citation omitted).

Plaintiffs contend that the proposed third amended complaint satisfies the third method of demonstrating official policy because the proposed pleading contains allegations that "policy level officials" had knowledge of the allegations contained in the complaint filed by another plaintiff in Jones.  A single lawsuit, however, would be insufficient to show the "pervasive" and "widespread" constitutional violations required by case law.  See Dunbar v. County of Saratoga, 358 F. Supp. 2d 115, 134 (N.D.N.Y. 2005) (evidence of one or two complaints does not establish a persistent and widespread practice reflecting a custom or usage).  The fact that purported NYMC "policy level officials" were informed of the substance of the DOJ's preliminary findings is likewise insufficient to show the awareness of NYMC final policymakers of a pervasive unconstitutional practice by NYMC employees for many reasons – but most obviously because there is no allegation that the preliminary findings indicated that NYMC had engaged in a widespread and pervasive unconstitutional practice.  The preliminary findings refer to conduct by WCJ, not NYMC, and they state only that WCJ did not provide inmates with "adequate" medical care.  3d Am. Compl. ¶ 54.  Moreover, the only specifics given as to how the medical care was below constitutional standards was that there was "an inadequate medical grievance process."  Id.  Such allegations do not show a widespread and pervasive practice or policy by NYMC to engage in conduct meeting the constitutional standard of deliberate indifference, a standard higher than mere negligence.  See Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003), cert. denied, 543 U.S. 1093 (2005).  While the complaint alleges that NYMC decided which doctors would be assigned to the WCJ, at the same time it makes clear that various other entities, including WCHCC, see 3d Am. Compl. ¶ 55, were also providing medical care at the

WCJ.

In any event, the conclusory labeling of an NYMC employee as a "policy level official" is not sufficient to demonstrate that such a person qualifies as a policymaking official for the purposes of a <u>Monell</u> analysis.  Plaintiffs have pleaded no facts related to the responsibilities and powers of the supposed "policy level officials" to permit an inference that these persons are in fact policymaking officials for the purpose of a <u>Monell</u> § 1983 claim.

As to the fourth method of demonstrating an official policy, the failure of a municipal defendant to supervise or train its agents only amounts to deliberate indifference to the rights of those with whom the municipal agents come into contact if "the need for more or better supervision to protect against constitutional violations was obvious."  <u>Vann</u>, 72 F.3d at 1049 (citation omitted).  Plaintiffs contend that despite being "responsible for the medical training or education of Bailey, Goldberg and Schramm, with respect to the medical and mental health care they provided to inmates in the WCJ," 3d Am. Compl. ¶ 31, "NYMC failed to train or supervise its employees or agents in how to respond to the grossly negligent, reckless and/or intentional infliction of pain and deliberate indifference to serious medical, dental and mental health needs of inmates in the WCJ, by DOC employees or agents," <u>id.</u> ¶ 59.  This allegation is conclusory, however.  It does not suggest that Drs. Bailey-Wallace, Goldberg, and Schramm failed to receive proper training in carrying out the provision of medical services.  The unstated implication that additional training was needed to treat conditions resulting from "grossly negligent, reckless and/or intentional infliction of pain and deliberate indifference" is unexplained and cannot form the basis for <u>Monell</u> liability.

For the foregoing reasons, plaintiffs' attempt to amend the second amended complaint by asserting a <u>Monell</u> claim against NYMC would be futile, as the proposed third amended

complaint fails to state such a claim.

      B.       Respondeat Superior Liability

The doctrine of respondeat superior "renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment." Riviello v. Waldron, 47 N.Y.2d 297, 302 (1979) (citations omitted).  However, "[a]n employer will not be held liable under this doctrine for actions which were not taken in furtherance of the employer's interests and which were undertaken by the employee for wholly personal motives." Galvani v. Nassau Cnty. Police Indemnification Review Bd., 242 A.D.2d 64, 68 (2d Dep't 1998) (citations omitted).  Nevertheless, an employer is not excused from liability "merely because [its] employees, acting in furtherance of [its] interests, exhibit human failings and perform negligently or otherwise than in an authorized manner." Riviello, 47 N.Y.2d at 302.  Instead, the test is "whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." Id. (internal quotation marks and citation omitted).  This principle, though, "is more simply said than applied." Id. at 302–03 (citing Riley v. Standard Oil Co., 231 N.Y. 301, 304 (1921)).

     The First Department court has summarized the case law as follows:

> There is no single mechanical test to determine whether at a particular moment an employee is engaged in the employer's business (see, Riley v Standard Oil Co., 231 NY 301, 304), but decisional law has yielded various formulations, which are instructive. Did the employee's act . . . fall within the direction and control of the employer? (See, Johnson v Daily News, 34 NY2d 33; Lundberg v State of New York, 25 NY2d 467.) Did the employee act under the express or implied authority of the employer? (See, Cooke v Drigant, 289 NY 313, 317.) Was the employee's act in furtherance of the employer's interests? (Sims v Bergamo, 3 NY2d 531, 535; Sauter v New York Tribune, supra; Clark v Harnischfeger Sales Corp., 238 App Div 493.) Were the employee's acts in the "discharge of duty" to the employer? (Joseph v City of Buffalo, 83 NY2d 141, 145.) Was it an act in the execution of the employer's orders or part of the work assigned by the employer? (See generally, 53 NY Jur 2d, Employment Relations, § 334.) Were the acts "so

closely connected" with what the employee was hired to do, and "so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment"? (Prosser and Keeton, Torts § 70, at 502 [5th ed.].)

Rausman v. Baugh, 248 A.D.2d 8, 10–11 (2d Dep't 1998).

NYMC argues that it cannot be liable for any claims in tort against Drs. Goldberg, Bailey-Wallace, and Schramm because there are "no allegations discussing the scope" of the three doctors' employment. NYMC Mem. at 8. In fact, the proposed third amended complaint – unlike the second amended complaint – alleges that the three doctors are employed by NYMC and it describes the scope of their employment. Thus, plaintiff alleges that NYMC employed Dr. Goldberg to provide medical care to WCJ inmates, 3d Am. Compl. ¶ 21; that NYMC employed Dr. Bailey-Wallace to provide medical care to WCJ inmates and to supervise Dr. Goldberg in his performance of his tasks, id. ¶ 22; and that NYMC employed Dr. Schramm to provide mental health care to WCJ inmates, id. ¶ 23.[6]

The tort claims plaintiffs assert against the doctors arise out of their roles as physicians. See, e.g., 3d Am. Compl. ¶¶ 67, 75(a)–(f), 95, 104. Because providing diagnoses and treatments as to the medical and mental ailments of WCJ inmates such as Dilworth are the doctors' obligations under their employment relationships with NYMC, any tortious carrying out of those acts ordinarily falls within the scope of the doctors' employment with NYMC. See, e.g., Mendez v. White, 40 A.D.3d 1057, 1057 (2d Dep't 2007) ("Under the doctrine of respondeat superior, a hospital may be vicariously liable for the medical malpractice of physicians who act in an employment or agency capacity.") (citations omitted); Bade v. Partridge, 2009 WL 4546639, at *5 (N.Y. Sup. Ct. Nov. 23, 2009) ("[A] hospital will be vicariously liable for

---

[6] The allegation in the second amended complaint that these doctors were employed by DOC and that DOC is "a division of NYMC," 2d Am. Comp. ¶¶ 39–41, has been eliminated.

malpractice committed by a doctor who is an employee of the hospital, if the doctor acted in furtherance of the hospital's business and within the scope of the doctor's employment."). Certainly, these doctors' treatment of inmates was not undertaken by them "for wholly personal motives." Galvani, 242 A.D.2d at 68.

NYMC argues that there are no allegations that NYMC was "made aware" of misconduct by these doctors and thus that the claim of vicarious liability must fail. NYMC Mem. at 9. NYMC's only citation for its assertion is to the Court's discussion of the availability of Monell liability against NYMC, id., which has no relevance to a claim of respondeat superior liability. In fact, awareness of a particular employee's propensity to commit a tort is not a requirement for respondeat superior liability. It is enough that "the tortious conduct is generally foreseeable and a natural incident of the employment." Judith M. v. Sisters of Charity Hosp., 93 N.Y.2d 932, 933 (1999).

While the Court rejects NYMC's arguments regarding vicarious liability, the state law claims against the doctors fail on the merits for the reasons described in Part IV.O below, based on arguments made by the attorney for County Defendants, which include these three doctors. Accordingly, there are no tortious acts for which NYMC may be vicariously liable.

C.     Third-Party Breach of Contract Claim

Plaintiffs' proposed third amended complaint adds a claim not previously asserted against NYMC: a claim that NYMC is liable to plaintiffs for breaching a contract between Westchester County and NYMC under which NYMC was to provide medical treatment to inmates at the WCJ. See 3d Am. Compl. ¶¶ 253–55. Plaintiffs were not parties to this contract. Id. ¶ 254. Plaintiffs argue that Dilworth is a third-party beneficiary to the contract between NYMC and Westchester County and has standing to sue for NYMC's alleged breach of that

agreement.  See Reply to NYMC at 7.

Under New York law, "[a] party asserting rights as a third-party beneficiary must establish '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'"  Cal. Pub. Emps.' Ret. Sys. v. Shearman & Sterling, 95 N.Y.2d 427, 434–35 (2000) (quoting Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 336 (1983)); accord Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Trust Co., 261 A.D.2d 117, 123 (1st Dep't 1999); Alicea v. City of New York, 145 A.D.2d 315, 317 (1st Dep't 1988) (citing Lindner, 59 N.Y.2d at 336).

Plaintiffs' claim fails because he has not pled the relevant provisions of the contract. Case law is clear that to state a breach of contract claim, the pleadings "must allege the provisions of the contract upon which the claim is based," Atkinson v. Mobil Oil Corp., 205 A.D.2d 719, 720 (2d Dep't 1994) (citation omitted); accord Phoenix Four, Inc. v. Strategic Res. Corp., 2006 WL 399396, at *10 (S.D.N.Y. Feb. 21, 2006) (citing cases), and the defendant's acts or omissions constituting the breach, see Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 651 F. Supp. 2d 155, 183 (S.D.N.Y. 2009) ("'[P]laintiff must provide specific allegations as to the agreement between the parties, the terms of that agreement, and what provisions of the agreement were breached as a result of the acts at issue.'") (citation and quotation marks omitted); Pappas v. Tzolis, 87 A.D.3d 889, 896 (1st Dep't 2011) ("The court also correctly dismissed the breach of contract cause of action because of plaintiffs' failure to allege specifically what the violation was.") (citation omitted); Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011) ("[S]tating in a conclusory

manner that an agreement was breached does not sustain a claim of breach of contract.") (citations omitted).

Plaintiffs do not identify what provision of the contract was violated; nor do they otherwise indicate the factual basis underlying the claim.  No paragraph of the proposed third amended complaint identifies or summarizes the relevant contractual provisions.  The proposed third amended complaint asserts only that "Defendants WCHCC and NYMC had a binding contract(s) with Westchester County for the provision of medical care to inmates in the WCJ, plaintiff was not a party to said contract(s), said contract(s) were intended for the benefit of plaintiff, the benefits of said contract(s) to plaintiff were immediate, and said defendants breached said contract(s)."  3d Am. Compl. ¶ 254.[7]  Thus, the proposed third amended complaint fails to apprise the Court and the parties of the "transactions, occurrences, or series of transactions or occurrences, intended to be proved" or of "the material elements of each cause of action or defense."  Atkinson, 205 A.D.2d at 720 (citations and quotation marks omitted).  Instead, the allegations amount to a formulaic recitation of the elements of a cause of action that fails to pass muster under Twombly.  See 550 U.S. at 555.  Plaintiffs' references to a local law, see Westchester Cnty. Act No. 62 (2007) (annexed as Ex. 1 to Deem Reply Decl.); Westchester Cnty. Act. No. 241 (2007) (annexed as Ex. 2 to Deem Reply Decl.), do not cure this problem for two reasons.  First, these laws authorize Westchester County to enter into a contract with the WCHCC, not NYMC.  Second, these laws merely authorize contracts and do not constitute contracts themselves.  Id.

_____

[7]  We do not consider the allegations regarding a contract between WCHCC  and Westchester County for the provision of medical, dental and mental health care to inmates in the WCJ.  See 3d Am. Compl. ¶¶ 27–28.  WCHCC is alleged to be a corporate entity distinct from NYMC.  Id. ¶ 16.

D.      Claims for Negligence, Medical Negligence and Gross Negligence

It is fundamental that to state a claim for negligence in New York, a plaintiff's allegations must establish"(1) that the defendant owed the plaintiff a cognizable duty of care, (2) that the defendant breached that duty, and (3) that the plaintiff suffered damages as a proximate result of that breach."  King v. Crossland Sav. Bank, 111 F.3d 251, 255 (2d Cir. 1997).  A person breaches a duty of care owed to another if the person fails to exercise reasonable care under the circumstances in the discharge of that duty.  See Allison v. Rite Aid Corp., 812 F. Supp. 2d 565, 568 (S.D.N.Y. 2011) (citation omitted); Beadleston v. Am. Tissue Corp., 41 A.D.3d 1074, 1076 (3d Dep't 2007).  But "[a]bsent a duty of care, there can be no breach thereof and no liability." Gray v. Wackenhut Servs., Inc., 721 F. Supp. 2d 282, 287 (S.D.N.Y. 2010), aff'd, 446 F. App'x 352 (2d Cir. 2011) (citing Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 341 (1928)).

Plaintiffs allege NYMC "had a duty to protect and care for Mr. Dilworth," 3d Am. Compl. ¶ 245, but fail to indicate the origins of the purported duty in the proposed third amended complaint.  Nor is any explanation given in their papers in support of the motion to amend.  The only theory of recovery plaintiffs advance in their memoranda in support of their claims of negligence against NYMC is respondeat superior liability for the torts of the individual defendant doctors.  See Reply to NYMC at 6–7.  Plaintiffs do not advance any theory under which any duty of care would run directly from NYMC to either plaintiff.  See id.; 3d Am. Compl. ¶¶ 244–50; Pl. Mem.  Therefore, plaintiffs' proposed third amended complaint fails to state a claim of negligence, medical negligence, or gross negligence against NYMC, and plaintiffs' motion to amend must be denied to the extent it seeks to add such claims.

E.    Claims for Negligent and Intentional Infliction of Emotional Distress

Under New York law,

the elements of a claim for intentional infliction of emotional distress are (i) extreme and outrageous conduct, (ii) an intent to cause—or disregard of a substantial probability of causing—severe emotional distress, (iii) a causal connection between the conduct and the injury, and (iv) the resultant severe emotional distress (Howell v. New York Post Co., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 [1993] ). The existence of extreme and outrageous conduct is also a necessary element for a claim of negligent infliction of emotional distress (see Berrios v. Our Lady of Mercy Med. Ctr., 20 A.D.3d 361, 362, 799 N.Y.S.2d 452 [2005]).

Lau v. S&M Enters., 72 A.D.3d 497, 498 (1st Dep't 2010); accord Conboy v. AT & T Corp., 241 F.3d 242, 258 (2d Cir. 2001) (quoting Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999)). This standard is "rigorous, and difficult to satisfy." Howell v. N.Y. Post Co., 81 N.Y.2d 115, 122 (1993) (citation omitted).  To state a valid claim, a plaintiff must show that a defendant's conduct was "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" Stuto, 164 F.3d at 827 (quoting Howell, 81 N.Y.2d at 122).  A claim for negligent infliction of emotional distress similarly requires a showing of conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." See Tartaro v. Allstate Indem. Co., 56 A.D.3d 758, 759 (2d Dep't 2008) (citations omitted).  No such conduct by NYMC is alleged here.  Indeed, plaintiffs do not respond on the merits to defendants' arguments on this point and thus have apparently abandoned this claim.

*        *        *

In sum, because none of the claims against NYMC could survive a motion to dismiss, leave to amend the complaint to add NYMC as a defendant is denied.

IV.     CLAIMS AGAINST THE COUNTY DEFENDANTS

Plaintiffs seek to make numerous amendments to the second amended complaint with respect to their claims against the County Defendants.  See Pl. Mem. at 1–2; Reply to Cnty. at 1.

A.     Procedural Objections

As an initial matter, defendants argue that plaintiffs should not be permitted to add factual allegations to bolster certain claims because those facts were known to or should have been known to plaintiffs when plaintiffs filed their prior pleadings in this action.  See Cnty. Mem. at 3–6.  Case law holds that "[w]here there is 'an inordinate delay' between the filing of the complaint and the motion to amend, then the party seeking to amend has the burden 'to provide a satisfactory explanation for the delay.'"  Mahar v. U.S. Xpress Enters., Inc., 688 F. Supp. 2d 95, 105 (N.D.N.Y. 2010) (quoting Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir. 1990)); accord Grace v. Rosenstock, 228 F.3d 40, 53–54 (2d Cir. 2000) ("The court . . . has discretion to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice other parties, or where the belated motion would unduly delay the course of proceedings by, for example, introducing new issues for discovery.") (citations omitted), cert. denied, 532 U.S. 923 (2001).  A district court "may deny a motion to amend when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed, particularly when the movant offers no excuse for the delay."  N.H. Ins. Co. v. Total Tool Supply, Inc., 621 F. Supp. 2d 121, 124 (S.D.N.Y. 2009) (quoting Turkenitz v. Metromotion, Inc., 1997 WL 773713, at *9 (S.D.N.Y. Dec. 12, 1997)).

Here, the district court ruled on the defendants' motion to dismiss the second amended complaint on September 30, 2011.  The plaintiffs stated their intention to file a third amended

complaint on October 18, 2011.  <u>See</u> Endorsed Letter from Adam Rodriguez to the Hon. Gabriel

W. Gorenstein, filed Jan. 17, 2012 (Docket # 314) ("01/17/12 Letter"); <u>see also</u> Scheduling

Order, filed Oct. 18, 2011 (Docket # 301).  At the request of both parties, discovery was stayed

beginning on January 27, 2012.  <u>See</u> 01/17/12 Letter.  Discovery had not yet substantially

progressed as of that date.  Thus, defendants have not shown any prejudice at all from the

addition of the new factual allegations.  While courts have in some instances denied motions to

amend based on delay, such decisions have arisen in circumstances far different from what

obtains here.  <u>See</u>, <u>e.g.</u>, <u>Bymoen v. Herzog, Heine, Geduld, Inc.</u>, 1991 WL 95387, at *2

(S.D.N.Y. May 28, 1991) (delay of more than four years, discovery already completed, summary

judgment motions had been filed); <u>Reisner v. Gen. Motors Corp.</u>, 511 F. Supp. 1167, 1172

(S.D.N.Y. 1981) (delay of nearly five years, discovery had closed, summary judgment motions

filed), <u>aff'd</u>, 671 F.2d 91 (2d Cir. 1982); <u>Harris Corp. v. McBride & Assocs., Inc.</u>, 2002 WL

1677695, at *3 (W.D.N.Y. July 19, 2002) (delay of six months after close of discovery; proposed

amendment would amount to a "180-degree reversal on the key issue" in the case).  Therefore,

the motion to amend will not be denied by reason of plaintiffs' delay in alleging facts that were

previously within their knowledge.[8]

     Accordingly, we now address each of the County Defendants' substantive objections to

the proposed amendments.

     B.     <u>Section 1983 Claims for Unconstitutional Conditions of Confinement</u>

     The County Defendants argue that the addition of the factual allegations would be futile

---

[8]  The County Defendants also argue that plaintiffs' motion should be denied because their
memorandum of law fails to describe each of the amendments they wish to make.  <u>See</u> Cnty.
Mem. at 3; Cnty. Surreply at 1–2.  While the Court believes that counsel had an obligation to
describe the particular amendments sought and to make arguments in support of plaintiffs'
motion addressed to those amendments, the Court cannot say that counsel's failure to actually
list the amendments should result in a wholesale denial of the motion to amend.

because the amended allegations of unconstitutional conditions of confinement fail to state a claim against the County Defendants, and the amendments should be denied for that reason. See Cnty. Mem. at 7–13.  In this claim, Dilworth alleges that 46 named employees of the WCJ "conspired to and in fact did subject Mr. Dilworth to unconstitutional conditions of confinement through the cumulative effects of their acts and omissions from September 16, 2008 through September 23, 2009 for the very purpose of causing physical and psychological harm and in retaliation for exercising his right to access the courts."  3d Am. Compl. ¶ 213.

As a pretrial detainee, Dilworth's claims under the Fourteenth Amendment are analyzed under the same standard as an Eighth Amendment claim for deliberate indifference.  See Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009).  The Supreme Court has held that "the Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)).  The Eighth Amendment imposes an obligation on prison officials to "provide humane conditions of confinement" including "adequate food, clothing, shelter and medical care."  Id. at 832 (citing cases).  To establish a violation of the Eighth Amendment on the basis of inadequate prison conditions, a prisoner must show that the defendants acted with "deliberate indifference to [his] health or safety."  Id. at 834 (citations and internal quotation marks omitted); accord Trammell v. Keane, 338 F.3d 155, 162 (2d Cir. 2003) (citing cases).  The deliberate indifference standard consists of both an objective and subjective prongs.  See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).

The objective component for a claim of deliberate indifference requires that the alleged deprivation be sufficiently serious that it denies a prisoner "the minimal civilized measure of life's necessities."  Wilson v. Seiter, 501 U.S. 294, 298 (1991) (quoting Rhodes, 452 U.S. at

43

347)).  A sufficiently serious deprivation means an objective "condition . . . that may produce death, degeneration or extreme pain."  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (citation and quotation marks omitted).  Prison officials may not "expose prisoners to conditions that 'pose an unreasonable risk of serious damage to their future health.'"  Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (brackets omitted) (quoting Helling v. McKinney, 509 U.S. 25, 35 (1993)).  "Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency."  Id. (citations omitted).

Under the subjective element, an official must act with a "sufficiently culpable state of mind" in causing the alleged deprivation.  Farmer, 511 U.S. at 834 (citations and internal quotation marks omitted).  This "entails something more than mere negligence" but less than purpose or knowledge.  Hathaway, 99 F.3d at 553 (citation and internal quotation marks omitted).  To be found culpable, the official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837; accord Caiozzo, 581 F.3d at 72.

With respect to his claim entitled "unconstitutional conditions of confinement," the County Defendants made arguments regarding Feaster, Vega, Tina Smith, Folkes, Calvin Smith, Christopher Smith, Muller, Santos, Kenney, Philips, Quast, Yancy, and Poggi.  Cnty. Mem. At 7–13.[9]  In response, Dilworth makes no effort to show how the various allegations against these

_____

[9]  The County Defendants' memorandum of law seeking denial of leave to amend with respect to these defendants makes no reference to the standards and case law governing any other claims against these defendants other than case law regarding deliberate indifference.  See Cnty. Mem. at 7.  Accordingly, we do not consider their arguments that leave to amend should be denied as to these defendants' inclusion in counts other than Count VII.  See S.D.N.Y. Local Civ. R. 7.1(a)(2) (requiring that arguments be supported by "cases and other authorities").  This ruling is

employees fits within the now settled case law described above that governs the circumstances under which a detainee or prisoner may make a claim of unconstitutional conditions of confinement.  See Reply to Cnty. at 5–6.  The factual allegations involving the defendants who are named only in this account include – to pick just one officer named in this count, Feaster – both minor deprivations, see 3d Am. Compl. ¶ 71(b) (Feaster prevented another inmate from delivering two meals to Dilworth one day); id. ¶ 135(c) (Feaster incorrectly told Dilworth that he lacked sufficient funds to make a commissary purchase), and unexplained ones, see, e.g., id. ¶ 170(d) ("Feaster arbitrarily confined Mr. Dilworth to his cell approximately thirty-five times.").  Dilworth's proposed third amended complaint states a claim against a number of defendants, see Dilworth, 2011 WL 4526555, at *11; e.g. 3d Am. Compl. ¶¶ 194–205, but his claim of "unconstitutional conditions of confinement" with respect to each of these 13 defendants is simply unexplained in his papers.  Dilworth's citation to cases regarding First Amendment retaliation, e.g., Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002), are simply irrelevant to the standards governing a deliberate indifference claim.

Dilworth argues that the court should consider the "cumulative effects of the concerted efforts of dozens of defendants to inflict severe psychological and emotional harm on Mr. Dilworth."  Reply to Cnty. at 6; see id. at 7 ("The cumulative effects of defendants' misconduct clearly violated the Eighth Amendment.").  But neither this argument nor anything else in the motion papers explains how each defendant was "personally involved [in]—that is [that he or she] directly participated [in]" the institution of the allegedly unconstitutional conditions of confinement, a prerequisite to § 1983 liability.  Gronowski v. Spencer, 424 F.3d 285, 293 (2d Cir. 2005).  In other words, even if it were true that the sum of numerous, non-actionable

---

without prejudice to any argument that may be made in the future by means of a motion to dismiss or a motion for summary judgment.

incidents could violate the deliberate indifference standard, there is no warrant under case law

for holding a particular defendant responsible for the cumulative effect of all of the violations

when that defendant was only personally involved in incidents that do not rise to the level of

deliberate indifference.  Plaintiffs' allegation that defendants "conspired to" cause him harm, 3d

Am. Compl. ¶ 213 – in addition to running afoul of the intra-corporate conspiracy doctrine, see

Dilworth, 2011 WL 3501869, at *21–22; Part IV.G below – is hopelessly vague and conclusory,

see Walker v. Jastremski, 430 F.3d 560, 564 n.5 (2d Cir. 2005) ("conclusory or general

allegations are insufficient to state a claim for conspiracy" to violate the plaintiff's civil rights),

cert. denied, 547 U.S. 1101 (2006), and is in any event insufficient to show personal

involvement.

In sum, the inclusion of the following defendants in Count VII would be futile: Feaster,

Vega, Tina Smith, Christopher Smith, Calvin Smith, Folkes, Muller, Santos, Kenney, Phillips,

Quast, Yancy, and Poggi, and thus leave to amend to include them in this count must be denied.

C.    Claims Against Officer Garrett

Plaintiffs' proposed third amended complaint includes Garrett in the unconstitutional

conditions of confinement claim.  See 3d Am. Compl. ¶¶ 212–14.  Garrett makes only a cursory

argument that the allegations regarding his conduct do not fit within the case law regarding

deliberate indifference.  See Cnty. Mem. at 13.  However, we reject this argument as there are

sufficient allegations in the proposed pleading to support a claim against him.  See, e.g., 3d Am.

Compl. ¶¶ 129(b), 150(a), 168.  Instead, Garrett principally argues that he should be dismissed

because the facts upon which the claim against him is based were previously known to plaintiffs,

and because plaintiffs did not mention this amendment in the memorandum of law in support of

their motion to amend.  See Cnty. Mem. at 3, 13.  As noted in Part IV.A above, the Court does

not find either argument to justify forbidding an amendment.  Therefore, amending the second amended complaint to add a claim of unconstitutional conditions of confinement against Garrett would not be futile.

     D.     Claims Against Officer Driesen

The County Defendants argue that the statute of limitations has run on the § 1983 claim plaintiffs now raise against Driesen.  See Cnty. Mem. at 13.  Causes of action arising under § 1983 are barred by the New York statute of limitations if not brought within three years of the date on which they accrued.  Bezerra v. County of Nassau, 846 F. Supp. 214, 218 (E.D.N.Y. 1994).  Plaintiffs first brought a § 1983 claim against Driesen on January 24, 2012 in the proposed third amended complaint.

     "A section 1983 claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of his section 1983 claim."  Id. (citing cases).  On January 23, 2009, Driesen "stated to Mr. Dilworth that if he signed fraudulent papers indicating he caused his own injuries and waived his legal claims against Westchester County and others [Dilworth] would be given an MRI and CT scan."  3d Am. Compl. ¶ 100(a).  "Driesen also directed Mr. Dilworth not to submit additional grievances until he signed said papers."  Id. ¶ 100(b).  Plaintiffs do not dispute that this is the date on which their cause of action against Driesen accrued.  See Reply to Cnty. at 7 ("Driesen's misconduct occurred on January 23, 2009.").

     Defendants' argument pretermits the fact that the identical allegations were made against Driesen in the Second Amended Complaint, which was filed on September 17, 2010.  See 2d Am. Comp. ¶ 107.  That pleading, although later dismissed, was filed within the statute of limitations period.  While the claims against Driesen were dismissed, the Third Amended Complaint relates back to the filing date of the Second Amended Complaint because it is

governed by the rule that relation back is available where the "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). While the claim was not in the "original" pleading, it was contained in a pleading that was timely filed as to this claim – that is, the Second Amended Complaint. Accordingly, the claim as against Driesen could not be dismissed on statute of limitations grounds.

E.    Claims for Substantial Burdens on Religious Exercise under § 1983

The County Defendants argue that "Plaintiffs should not be granted leave to add the new § 1983 Claim for Substantial Burden on Religious Exercise" because "Plaintiffs concede that failing to include this claim previously was an oversight, and have no excuse for this undue delay." Cnty. Mem. at 14 (citing Pl. Mem. at 5). However, the Second Amended Complaint in fact contains a § 1983 claim for burdens on religious exercise against the very same defendants named in the proposed third amended complaint's § 1983 claim for burdens on religious exercise. Compare 2d Am. Compl. ¶ 229 (asserting claim § 1983 claim for "violation of First Amendment rights" against Foy, Quast, Rogers, Schmidt, Tejeda, Wyatt, and others for "depriv[ing] Mr. Dilworth of his constitutional rights to . . . exercise his religion"), with 3d Am. Compl. ¶ 210 (asserting § 1983 and § 2000cc-1 claims against Foy, Quast, Rogers, Schmidt, Tejeda, and Wyatt for "den[ying] and impos[ing] substantial burdens on Mr. Dilworth's right to exercise his religion while a pretrial detainee in the WCJ, without a legitimate penological interest."). Because the premise of the County Defendants' sole objection is not correct, it is rejected.

F.    Claims for Substantial Burdens on Religious Exercise under § 2000cc-1

Plaintiffs allege that Foy, Quast, Rogers, Schmidt, Tejeda, and Wyatt "denied and

48

imposed substantial burdens on Mr. Dilworth's right to exercise his religion while a pretrial

detainee in the WCJ, without a legitimate penological interest" and in violation of the Religious

Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1.  3d Am. Compl.

¶ 210.  The RLUIPA prohibits a government from imposing substantial burdens on the religious

exercise of incarcerated persons if the burden "is imposed in a program or activity that receives

Federal financial assistance."  42 U.S.C. § 2000cc-1.  As defendants point out, the proposed

Third Amended Complaint does not allege that the prison is a program or activity that receives

federal financial assistance.  Cnty. Mem. at 14.  Plaintiffs in reply do not suggest otherwise.  See

Reply to Cnty. at 8.  Accordingly, this claim would have to be dismissed.

       G.     Claim of Conspiracy to Violate § 1981

      Plaintiffs allege that Bourhill, Tony Freeman, Garrett, Patrick, Quinoy, Rogers,

SanMarco, Santos, Christopher Smith, Tejeda, Turner, Wyatt, and multiple "Frank Foe"

defendants conspired to deny him various benefits on account of his race, in violation of 42

U.S.C. § 1981.  See 3d Am. Compl. ¶¶ 236–39.  Bourhill, Tony Freeman, Garrett, Patrick,

Quinoy, Rogers, SanMarco, Santos, Christopher Smith, Tejeda, Turner, and Wyatt were all

employed by the DOC as correctional officers.  See id. ¶¶ 18(d)–(g).  The employer and roles of

the unidentified Frank Foe defendants in the alleged conspiracy are unknown.  The only factual

allegation as to the Frank Foe defendants is that they "at all times relevant conspired with

defendants Bourhill and/or Klivans to violate plaintiffs' constitutional rights."  Id. ¶ 19.

      Plaintiffs argue that the defendants violated § 1981 by denying Dilworth, on account of

his race, "the full benefits and protections of the contract for medical care between Westchester

County and NYMC and/or WCHCC; prevent[ing] him from accessing medical care from

WCHCC upon release from custody; [and] deny[ing] him the right[s] to make and enforce

contracts regarding his commissary purchases [and to] pursue his legal claims in federal court."

Id. ¶ 238.  Specifically, pursuant to this conspiracy, one or more of the defendants:

> used racial slurs; denied him medical care; denied pain medication; interfered with, altered or discarded purchase orders with the WCJ's commissary vendor; failed to deliver goods purchased; tampered with his inmate financial account; expressly withheld medical care in exchange for Mr. Dilworth waiving his legal claims against Westchester County and others; failed to stop or prevent prolonged intentional infliction of pain and denial of medical care for serious medical needs in retaliation for pursuing a federal civil rights lawsuit; knowingly notarized fraudulent documents intended to be submitted to the Pro Se Clerk, S.D.N.Y.; threatened physical bodily harm and death; subjected Mr. Dilworth to unconstitutional conditions of confinement and/or torture while in custody of the WCJ; affirmatively misrepresented Mr. Dilworth's medical condition and history prior to and after release from the WCJ; warned Bourhill of Mr. Dilworth's presence at J&J to avoid detection and identification; [and] threatened Mr. Dilworth while in his doctor's office on December 28, 2011.

Id. ¶ 239.

To state a claim under § 1981, "a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute."  Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).  Although § 1981 may serve as the predicate for a conspiracy claim under 42 U.S.C. § 1985, § 1981 does not itself provide a mechanism for recovering upon a claim of conspiring to violate § 1981.  See Washington v. Niagara Mohawk Power Corp., 103 F. Supp. 2d 517, 521 (N.D.N.Y. 2000) ("Section 1981, standing alone, does not create a right to recover for conspiracy, and must be pled with § 1985 to state a claim of conspiracy.").  Rather, § 1985 provides that mechanism.  Id. ("'[A] violation of federal rights secured by § 1981 may serve as the basis of a § 1985 claim.'") (citation omitted).  Therefore, the Court construes plaintiffs' "§ 1981 Claim for Conspiracy" as alleging a claim under § 1985 of a conspiracy to violate plaintiffs' § 1981 rights.

In order to state a claim for conspiracy under § 1985 a plaintiff must show that there was (1) an agreement between two or more actors to (2) deprive the plaintiff of a legal right or privilege, (3) that an overt was undertaken in furtherance of the conspiracy, and (4) that the plaintiff sustained an injury to his person or property, or was deprived of a right or privilege of a United States citizen.  Tardd v. Brookhaven Nat'l Lab., 407 F. Supp. 2d 404, 413 (E.D.N.Y. 2006); see also 42 U.S.C. §§ 1985(2)–(3); Walker v. N.Y.C. Dep't of Corr., 2008 WL 4974425, at *11 (S.D.N.Y. Nov. 19, 2008); Anemone v. Metro. Transp. Auth., 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006).  However, a plaintiff's allegations fail to state a § 1985 conspiracy claim "if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment."  Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir.), cert. denied, 439 U.S. 1003 (1978); see also Tardd, 407 F. Supp. 2d at 414 (concluding that intra-corporate conspiracy doctrine applies to § 1985 claim of conspiracy to violate § 1981).  The same principle applies to a municipal entity, such as a county.  See, e.g., Crews v. County of Nassau, 2007 WL 4591325, at *12 (E.D.N.Y. Dec. 27, 2007) ("[T]he officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other.") (citing cases).  Because the complaint alleges that all of the alleged conspirators were either employees or otherwise agents of Westchester County acting within the scope of their employment, the conspiracy claim cannot stand because Westchester County cannot be found to have conspired with itself.

An exception to this intracorporate conspiracy doctrine exists where the plaintiff alleges facts that tend to show that, by engaging in the conspiracy, the defendants were "pursuing personal interests wholly separate and apart from the entity."  Hartline v. Gallo, 2006 WL

2850609, at *9 (E.D.N.Y. Sept. 30, 2006) (citation and quotation marks omitted); accord

Salgado v. City of New York, 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (citing Girard

v. 94th St. & Fifth Ave. Corp., 530 F.2d 56, 71–72 (2d Cir.), cert. denied, 425 U.S. 974 (1976))

(other citations omitted); Tardd, 407 F. Supp. 2d at 414–15 (exception applies where defendants

are motivated by an "independent personal stake"); Roniger v. McCall, 22 F. Supp. 2d 156,

167–68 (S.D.N.Y. 1998).

This Court recommended dismissal of the conspiracy claims plaintiffs brought in the

second amended complaint under §§ 1985(2)–(3) because they violated the intracorporate

conspiracy doctrine, see Dilworth, 2011 WL 3501869, at *21–22—a disposition that was

adopted by the district judge, see Dilworth, 2011 WL 4526555, at *11.  The same shortcomings

apply to the claims in the proposed third amended complaint that the various County Defendants

conspired to violate § 1981.  As with the § 1985 conspiracy claims in the second amended

complaint, defendants here were all employees of the same employer, the WCJ, undertaking acts

within the scope of their employment.  Likewise, contrary to plaintiffs' assertion, see Reply to

Cnty. at 2, plaintiffs' allegations lack a basis from which it could be inferred that these

defendants pursued interests wholly distinct from those of the WCJ.

Plaintiffs argue that a jury may infer that the defendants pursued their own interests

because various officers pressured Dilworth to sign documents that would release his legal

claims against Westchester County and other defendants.  See id. (citing 3d Am. Compl.

¶¶ 66(z), 87(j)–(k), 89(d), 100(a), 126(d), 161(g)).  In all but one of the cited instances, however,

the officers explicitly pressured Dilworth to drop his legal claims against Westchester County.

See 3d Am. Compl. ¶¶ 66(z), 87(j)–(k), 89(d), 100(a), 161(g).  In the other instance, Patrick

requested that Dilworth waive "his legal claims," id. ¶ 126(d), which at the time included claims

against Westchester County.  Plainly, an employee who demands that a plaintiff drop legal claims against his employer is not pursuing interests that are independent from those of his employer.  Indeed, even if an employee of the WCJ had demanded that Dilworth drop a claim against him personally, such a demand would plainly further the interests of the WCJ given that Westchester County routinely represents and indemnifies its employees in suits brought by detainees.

Plaintiffs also argue that the intracorporate conspiracy doctrine does not apply to situations "where continuing, separate instances of discrimination [or misconduct] are alleged." Reply to Cnty. at 2 (citation omitted) (modification in 3d Am. Compl.).  The exception appears to originate from dictum in Dombrowski v. Dowling, 459 F.2d 190 (7th Cir. 1972), which notes that a conspiracy does not exist for the purposes of § 1985 "if the challenged conduct is essentially a single act of discrimination by a single business entity," but which also states that "[a]gents of the [entity] certainly could not carry out [multiple] acts of violence with impunity," id. at 196.  See, e.g., Rackin v. Univ. of Pa., 386 F. Supp. 992, 1005–06 (E.D. Pa. 1974) (concluding that a conspiracy existed because the "allegations comprise much more than 'essentially a single act of discrimination by a single business entity'") (quoting Dombrowski, 459 F.2d at 196).  The Seventh Circuit has since explicitly renounced the notion that there is a "multiple acts" exception to the intra-corporate conspiracy doctrine on the ground that it "responds neither to the text nor to the objectives of § 1985."  See Travis v. Gary Cmty. Mental Health Ctr., Inc., 921 F.2d 108, 111 (7th Cir. 1990).  This Court agrees with the reasoning of the Seventh Circuit and other courts that have rejected this purported exception.  See, e.g., id.; Johnson v. Nyack Hosp., 954 F. Supp. 717, 723–24 (S.D.N.Y. 1997); Rosenberg v. City of New York, 2011 WL 4592803, at *13–14 (E.D.N.Y. Sept. 30, 2011); Scott v. Township of Bristol,

1990 WL 178556, at *7 n.6 (E.D. Pa. Nov. 14, 1990); Weaver v. Gross, 605 F. Supp. 210, 214

(D.D.C. 1985).  Plaintiffs' § 1985 claim of a conspiracy to violate plaintiffs' § 1981 rights, see

3d Am. Compl. ¶¶ 236–39, therefore fails to state a claim and must be excluded from the third

amended complaint, as its inclusion would be futile.

> H.    Claim of Conspiracy to Violate § 1983

Plaintiffs allege that Bourhill, Klivans, Maccabee, O'Neill, Patrick, Quinoy, Rogers,

SanMarco, Santos, Schmidt, Tejeda, Wyatt, and various "Frank Foe" defendants undertook a

§ 1983 conspiracy to violate Dilworth's First Amendment rights in retaliation for his filing a

lawsuit against the County Defendants.  See id. ¶ 223.  All named defendants were employed by

the DOC as correctional officers.  See id. ¶¶ 18(d)–(g).  Plaintiffs argue that the defendants

violated § 1983 by:

> denying him the right to freely associate, threatening physical harm, threatening
> the lives of his children, denying him the right to practice his religion, filing
> fraudulent disciplinary charges against him, maliciously and sadistically inflicting
> severe pain, denying him pain medication, confining him to his cell and holding
> pens arbitrarily, preventing him from tending to daily hygienic needs, inducing
> him to soil his clothes with his own bodily waste, denying him use of medical
> aides, interfering with his commerce and contract rights, denying him food,
> depriving him of his property and Bible without due process of law, interfering
> with the free flow of his mail, interfering with and preventing visits with his wife
> and criminal defense attorney, threatening physical harm to Mr. Dilworth in the
> presence of his son, and generally denying him everything they possibly could
> deny him throughout his detainment.

Id. ¶ 223.

The intracorporate conspiracy doctrine applies to claims of § 1983 conspiracy.  See, e.g.,

Anemone, 419 F. Supp. 2d at 604.  As with the  claim of conspiracy to violate § 1981, the above

defendants were all employed by the same employer.  Additionally, the allegations allow the

inference only that they were acting within the scope of their employment in committing each

act underlying this claim.  Indeed, plaintiffs do not contend that these defendants were acting

outside the scope of their employment.  See Reply to Cnty. at 2–3.

In support of their argument that the defendants pursued interests independent of their employer in engaging in a § 1983 conspiracy, plaintiffs cite the same facts that they cited in support of their argument that the intracorporate conspiracy doctrine did not apply to the § 1981 conspiracy claim.  See Reply to Cnty. at 2.  As discussed in the previous section, these facts do not permit an inference that the defendants pursued interests that were separate from those of Westchester County.  Therefore, the § 1983 conspiracy claim is barred by the intracorporate conspiracy doctrine.

I.    Claims of Intentional Race Discrimination Against Muller, Santos, and Tejeda

The County Defendants argue that plaintiffs' claims of intentional racial discrimination against Muller, Santos, and Tejeda in violation of § 1983, see 3d Am. Compl. ¶¶ 215–18, should be dismissed because absent the previously-known factual allegations regarding the three defendants, the proposed third amended complaint would fail to state a claim against the defendants.  See Cnty. Mem. at 18.  Because the Court is permitting plaintiffs to amend the pleadings by adding previously known facts, see Part IV.A above, and defendants do not proffer any other basis for disallowing these claims, the Court will permit the amendments relating to the claims of intentional race discrimination against Muller, Santos, and Tejeda.

J.    Claims of Intentional Race Discrimination Against SanMarco and Wyatt

Plaintiffs bring claims under § 1983 alleging that SanMarco and Wyatt, among others, denied him Equal Protection on account of his race.  See 3d Am. Compl. ¶¶ 215–18.  To establish that a government action violated a plaintiff's rights secured by the Equal Protection Clause, a plaintiff must offer proof of both a racially discriminatory purpose and effect of the action.  McCleskey v. Kemp, 481 U.S. 279, 292–93 (1987); see also City of Cuyahoga Falls v.

<u>Buckeye Cmty. Hope Found.</u>, 538 U.S. 188, 194 (2003); <u>Village of Arlington Heights v. Metro.</u>
<u>Hous. Dev. Corp.</u>, 429 U.S. 252, 265 (1977).

The County Defendants argue that plaintiffs' claims against SanMarco and Wyatt fail
because the proposed third amended complaint is devoid of allegations permitting a reasonable
inference that the defendants acted upon racial animus.  <u>See</u> Cnty. Mem. at 15–16, 18.

Plaintiffs argue that racial animus may be imputed to SanMarco's actions because
SanMarco compelled Dilworth to watch the beating of another inmate, James Bowen, by Patrick.
<u>See</u> Reply to Cnty. at 9, 11 (citing 3d Am. Compl. ¶ 87).  Plaintiffs' proposed third amended
complaint, however, does not state the race of Bowen or otherwise contain any facts permitting
an inference as to his race.  Even if plaintiffs had alleged Bowen's race, such an allegation would
not provide any insight into SanMarco's motivation for not intervening in the beating of Bowen
or of forcing Dilworth to watch the beating.

Plaintiffs argue that racial animus may be imputed to Wyatt's actions because Wyatt
carried out certain orders of Rogers, which adversely affected Dilworth, and Rogers issued his
orders out of racial animus toward Dilworth.  <u>See</u> Reply to Cnty. at 10, 11 (citing 3d Am.
Compl. ¶ 158).  But the complaint is devoid of any non-conclusory allegations shedding light on
Wyatt's purpose in carrying out Rogers's orders.  That Wyatt carried out Rogers's orders,
without more, says nothing about Wyatt's own motive for acting upon the orders.

For these reasons, the proposed third amended complaint fails to state a § 1983 claim of
intentional racial discrimination against Wyatt and SanMarco.  Because permitting an
amendment to include such claims would be futile, they must be excluded from the third
amended complaint.

    K.    <u>Claims Against Bourhill</u>

Plaintiffs assert four claims against Bourhill: (1) § 1983 violation for unconstitutional conditions of confinement; (2) § 1983 violation for intentional racial discrimination; (3) § 1985 conspiracy to violate Dilworth's § 1981 rights; and (4) § 1983 conspiracy to violate Dilworth's First Amendment rights.  The Court has already found plaintiffs' two conspiracy claims wanting. See Part IV.G–H above.  Accordingly, these will not be addressed further.

As to the first and second claims, the proposed third amended complaint contains the following relevant allegations respecting Bourhill: (1) Bourhill was present at an incident in which Dilworth urinated on himself after a correctional officer denied him the opportunity to use a toilet, and another officer did not permit him to change his soiled clothing before finishing his visit with his wife, 3d Am. Compl. ¶ 129(d); (2) Bourhill overheard a Muslim imam opine that Dilworth should be in a wheelchair and in the hospital, and was present when another officer stated to the imam, "We're breaking [Dilworth]," id.; and (3) Bourhill "hung on the front door of plaintiffs' residence a DOC prison uniform containing several writings and markings including the plaintiffs' last name, 'nigger,' 'we no [sic] wear [sic] you live so sh[ut] your mouth,' and which made mockery of Mr. Dilworth's severe injuries by making references to his lack of bowel and bladder control," id. ¶ 184 (bracketing in 3d Am. Compl.).

As to the unconstitutional conditions of confinement claim, plaintiffs do not state how long Dilworth had to endure wearing his soiled clothing, how long he was deprived of the use of a toilet, or whether his physical contact with his urine caused him a serious risk of harm. Without more, the allegation that Dilworth lacked the opportunity to use a restroom for a brief period fails to establish an Eighth Amendment violation.  "The temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation."  Whitted v. Lazerson, 1998 WL

259929, at *2 (S.D.N.Y. May 21, 1998) (no Eighth Amendment violation where plaintiff defecated and urinated on himself after being deprived of the use of a toilet for 90 minutes); see also Gill v. Riddick, 2005 WL 755745, at *16 (N.D.N.Y. Mar. 31, 2005) ("Gill has not alleged any injury to his health as a result of being forced to hold his urine and any discomfort he experienced lasted only seventy minutes, at most.  No matter how humiliating urinating on oneself can be, . . . Gill has failed to prove the objective component . . . .").  That Bourhill disregarded the opinion of a layperson that an inmate should be in the hospital or a wheelchair does not constitute deliberate indifference to Dilworth's serious medical need.  Moreover, the proposed third amended complaint lacks any allegations as to Dilworth's actual physical condition when the imam rendered this opinion, other than that Dilworth had urinated on himself, which is not by itself a sufficiently serious condition to implicate the Eighth Amendment.  The statement by the correctional officer, "We're breaking [Dilworth]," to the imam in the presence of Bourhill likewise is irrelevant, since the only deprivation Dilworth was then enduring was the inability to briefly use the bathroom and to immediately change his soiled clothing, which are de minimis.  Therefore, plaintiffs' § 1983 claim for unconstitutional conditions of confinement against Bourhill could not survive a motion to dismiss.

Bourhill's only argument regarding the prison uniform incident is that it could not be reasonably inferred that Bourhill was acting under color of state law.  Cnty. Mem. at 18.  "In order to state a claim under § 1983, a plaintiff must allege that he was injured by either a state actor or a private party acting under color of state law."  Ciambriello v. County of Nassau, 292 F.3d 307, 323 (2d Cir. 2002) (citation omitted).  Inasmuch as it is alleged that Bourhill was a correction officer and it may be reasonably inferred that the uniform incident relates directly to the relationship between Bourhill as a correction officer and Dilworth as a former detainee, the

argument that Bourhill was not acting under color of law is rejected.  See generally Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (conduct that is "ostensibly private" constitutes state action where there is "'such a close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself'") (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)).  Accordingly, plaintiffs' § 1983 claim of intentional race discrimination against Bourhill may be included in any new pleading.

L.     Claims Against Tony Freeman

The proposed third amended complaint asserts a § 1983 claim against Tony Freeman for unconstitutional conditions of confinement and a § 1985 claim of conspiracy to violate Dilworth's § 1981 rights.  The Court has already ruled that the addition of the conspiracy claim is futile.  See Part IV.G above. The § 1983 unconstitutional conditions of confinement claim is based on the allegation that Tony Freeman "notarized fraudulent papers submitted to him by someone other than Mr. Dilworth. Said papers were addressed and mailed to the Pro Se Clerk, Southern District of New York, and sought leave to withdraw Mr. Dilworth's pro se complaint in his original action.  Said fraudulent papers were received by the Pro Se Clerk on May 8, 2009." 3d Am. Compl. ¶ 141.  A claim of unconstitutional conditions of confinement, however, requires that a plaintiff show that the conditions reflected "deliberate indifference to [his] health or safety."  Farmer, 511 U.S. at 834 (citations and quotation marks omitted).  The allegations at issue here do not relate to these matters and thus their inclusion could not survive a motion to dismiss.

M.     Claims for Loss of Consortium

Plaintiffs assert a claim under § 1983 of loss of consortium.  See id. ¶¶ 256–57.  Loss of

consortium claims are not cognizable under § 1983 because "they do not involve an injury based on a deprivation of the plaintiff's rights, privileges, and immunities."  Veronese v. Malloy, 2011 WL 6012023, at *2 (N.D.N.Y. Oct. 21, 2011) (internal quotation marks and citations omitted); accord Spavone v. Fischer, 2012 WL 360289, at *6 (S.D.N.Y. Feb. 3, 2012) ("§ 1983 does not support derivative claims for loss of consortium.") (citations and quotation marks omitted); Harrison v. Harlem Hosp., 2007 WL 2822231, at *4 (S.D.N.Y. Sept. 28, 2007); Wahhab v. City of New York, 386 F. Supp. 2d 277, 292 (S.D.N.Y. 2005); Phillips v. DeAngelis, 571 F. Supp. 2d 347, 358–59 (N.D.N.Y. 2008); Shenk v. Cattaraugus County, 2007 WL 2874427, at *6 (W.D.N.Y. Sept. 27, 2007); Pritzker v. City of Hudson, 26 F. Supp. 2d 433, 445 (N.D.N.Y. 1998).  Because an amendment to add the claim would be futile, it will not be permitted.

N.     Claims of Negligence and Medical Negligence Against Westchester County

The County Defendants initially objected to plaintiffs' claims of negligence and medical negligence against the County.  See Cnty. Mem. at 19–22.  They have since withdrawn their objections "provided that the language of Count XIV in the proposed [third amended complaint] is modified to be consistent with Judge Holwell's September 30, 2011 Order."  Cnty. Surreply at 3.  Plaintiffs assert that they have waived all claims contained in the late notice of claim, to the extent the claims exceed that which Judge Holwell's decision permitted them to assert. See Reply to Cnty. at 12.  Accordingly, leave to amend is granted to the extent consistent with plaintiffs' representations in their briefing.

O.     Claims of Negligence, Medical Negligence, Gross Negligence, and Intentional or Negligent Infliction of Emotional Distress against Bailey-Wallace, Goldberg, and Schramm

Lastly, the County Defendants argue that this Court should dismiss the plaintiffs' state law tort claims against the three doctors, 3d Am. Compl. ¶ 244–50, because (1) plaintiffs

allegedly abandoned related claims in the first amended complaint, (2) the claims are time-barred as to Drs. Bailey-Wallace and Schramm, and (3) the allegations fail to state claims of gross negligence or negligent or intentional infliction of emotional distress against the physicians and would therefore be futile.[10]  See Cnty. Mem. at 22–25.

1.    Abandonment of Claims

Plaintiffs did not make claims of medical malpractice in their first or second amended complaint, see 2d Am. Compl. ¶ 49, and now allege claims only of negligence and "medical negligence" against Drs. Bailey-Wallace, Goldberg, and Schramm in the proposed third amended complaint, see 3d Am. Compl. ¶¶ 244–50.  The County Defendants contend that because plaintiffs previously abandoned medical malpractice claims, they cannot now raise other claims arising out of the physicians' medical treatment of Dilworth.[11]  See Cnty. Mem. at 22.  Even if plaintiffs were essentially reasserting claims that they had previously abandoned, this would not be a basis in and of itself for denying the amendment, as plaintiffs are generally permitted to reassert abandoned claims unless "undue prejudice or delay will result from the amendment."  Georgiadis v. First Bos. Corp., 1992 WL 51500, at *2 (S.D.N.Y. Mar. 9, 1992) (citing cases); accord Ferguson v. Kelly, 1991 WL 129799, at *1 (W.D.N.Y. June 30, 1991)

---

[10]    The County Defendants also argue in their memorandum in opposition that these claims should be dismissed because plaintiffs failed to comply with New York General Municipal Law § 50-d.  See Cnty. Mem. at 23.  The County Defendants appear to have withdrawn this objection, however, on the ground that plaintiffs have waived all claims under the December 31, 2009 notice of claim "to the extent it is broader than Judge Holwell's Opinion & Order dated September 30, 2011."  Cnty. Surreply at 5.  Therefore, the Court does not consider this argument.

[11]    Plaintiffs invite the Court to disregard this argument on the ground that the County Defendants' memorandum failed to cite to any legal authority for this contention.  See Pl. Surreply at 4.  Given the paucity of citations to legal authority in plaintiffs' own moving papers, it is to the plaintiffs' advantage that this Court has exercised its discretion to consider certain arguments advanced by the parties even where those arguments were not supported by citations to legal authority.

("[D]ismissal shall be without prejudice should the petitioner unequivocally abandon his unexhausted claim.") (citation omitted).  The County Defendants do not contend, let alone show, that they would endure undue prejudice or delay were the Court to permit these particular amendments.  The Court therefore rejects this argument for denying leave to amend to add these claims.

2.    <u>Merger of Negligence Claims with Malpractice</u>

Plaintiffs do not purport to bring a claim of malpractice against Drs. Bailey, Goldberg or Schramm.  <u>See</u> Reply to Cnty. at 16 ("Plaintiffs have not alleged any [medical malpractice] claims against any defendant.")  Plaintiffs take this position presumably to avoid the notice requirements in N.Y. Gen. Mun. Law § 50-d, which plaintiffs contend "only applies to claims of medical malpractice," Reply to Cnty. at 16, and to avoid any bar imposed by the applicable statute of limitations in N.Y. Gen. Mun. Law § 50-i(1)(c).

However, case law is clear that "medical malpractice is simply a form of negligence." <u>Scott v. Uljanov</u>, 74 N.Y.2d 673, 674 (1989).  And "no rigid analytical line separates the two." <u>Id.</u>  The principal purpose for distinguishing claims of medical malpractice from other negligence claims is that "for policy reasons the [New York] Legislature has chosen to affix different Statutes of Limitations to medical negligence (or malpractice) and negligence generally."  <u>Id.</u>  As such, a medical malpractice claim is merely a negligence claim in which the conduct from which the claim arises, "'constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician.'"  <u>Id.</u> at 675 (quoting <u>Bleiler v. Bodnar</u>, 65 N.Y.2d 65, 72 (1985)); <u>accord</u> <u>Abascal v. State</u>, 93 A.D.3d 1216, 1217 (4th Dep't 2012); <u>McDonald v. State</u>, 13 A.D.3d 1199, 1200 (4th Dep't 2004).  Thus, when allegations in a complaint "sound[] in . . . medical malpractice," they "may be deemed

62

malpractice, rather than negligence."  Scott, 74 N.Y.2d at 674–75.

Accordingly, that plaintiffs have chosen to call their claim "medical negligence" rather than "malpractice" is not controlling.  Notwithstanding the label they have affixed, so long as plaintiffs' claim against the doctors employed at the WCJ sounds in medical malpractice, plaintiffs must comply General Municipal Law § 50-d and other statutes governing medical malpractice claims.  See, e.g., id.; Caruso v. County of Westchester, 220 A.D.2d 746, 746 (2d Dep't 1995) (notice of claim required for claim that "sounds in medical malpractice"); cf. Abascal, 93 A.D.3d at 1217 ("Because the claim substantially related to medical diagnosis and treatment, the action it gives rise to is by definition one for medical malpractice rather than for simple negligence.") (quoting McDonald, 13 A.D.3d at 1200) (internal quotation marks omitted).  The plaintiffs' allegations against Drs. Schramm, Bailey-Wallace and Goldberg arise out of their conduct as providers of medical services to Dilworth, including treatment and diagnoses, or failures in this regard.  See, e.g., Compl. ¶¶ 22, 23, 30, 55, 90, 113, 125, 139, 145. Therefore these claims sound in claims of medical malpractice, rather than ordinary negligence.

Plaintiff makes no argument that he can pursue claims for medical malpractice against these defendants.  See Reply to Cnty. at 16.  Nor does the complaint purport to make such claims.  Accordingly, the claims for "negligence" and "medical negligence" could not survive a motion to dismiss.

> 3. Merits of Claims of Gross Negligence and Intentional and Negligent
> Infliction of Emotional Distress Against Drs. Goldberg, Bailey-Wallace
> and Schramm

The County Defendants argue that the proposed third amended complaint fails to state claims of gross negligence and intentional or negligent infliction of emotional distress against the three doctors.  See Cnty. Mem. at 24–25.  To state a claim for gross negligence in New York,

a plaintiff must demonstrate that the defendant owed the plaintiff a duty and the defendant failed to exercise "even slight care" in the discharge of that duty.  Food Pageant, Inc. v. Consol. Edison Co., 54 N.Y.2d 167, 172 (1981).  That is, "a party's conduct must smack of intentional wrongdoing or evince a reckless indifference to the rights of others."  Ryan v. IM Kapco, Inc., 88 A.D.3d 682, 683 (2d Dep't 2011) (citations, brackets, and quotations omitted).  The case law described in the previous section suggests that plaintiffs cannot avoid the statute of limitations and other hurdles to malpractice actions by characterizing their claim as one of "gross" rather than simple negligence.  In any event, a claim of gross negligence requires a showing of conduct that "exceed[s] that of ordinary malpractice and verge[s] on criminality."  Garber v. Lynn, 79 A.D.3d 401, 405 (1st Dep't 2010) (citations omitted).  None of the allegations against the doctors meet this standard.

As we have already noted in Part III.E above, claims of intentional and negligent infliction of emotional distress require a showing of conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Stuto, 164 F.3d at 827 (citation and quotation marks omitted); accord Tartaro, 56 A.D.3d at 759.  This standard is not met as to any of the three doctors.

As to Dr. Bailey, the proposed third amended complaint alleges in a wholly conclusory manner that she "intentionally . . . misdiagnosed" Dilworth.  3d Am. Compl. ¶ 95(c).  As to Dr. Schramm, it is alleged that he "failed to provide any mental health care" to Dilworth, id. ¶ 104(i), which "shortened the time in which Mr. Dilworth developed Post Traumatic Stress Disorder and exacerbated its intensity."  Id. ¶ 104(j).  These allegations are insufficient to meet the standard of "extreme and outrageous conduct."

The allegations that mention Dr. Goldberg are more extensive, but essentially amount to complaints about Dr. Goldberg's medical treatment of plaintiff, including his failure to prescribe or continue medical treatments, equipment, and medications that Dilworth contends were necessary.  See, e.g., id. ¶¶ 90, 113, 125, 139.  For example, during one treatment session, Dr. Goldberg "manipulated" Dilworth's legs, causing Dilworth to scream for Dr. Goldberg to stop, but Dr. Goldberg did not do so.  Id. ¶ 111.  On another occasion, "Goldberg threatened to stop Mr. Dilworth's pain medications unless he identified the person responsible for assigning him to a handicap cell."  Id. ¶ 137(b). These claims do not suggest "an intent to cause—or disregard of a substantial probability of causing—severe emotional distress."  Nor do they constitute "extreme and outrageous conduct."  Plaintiffs point to no case allowing such claims to proceed on facts analogous to the instant case.  Indeed, their brief in opposition to the defendant's motion on this point, Reply to Cnty. at 16, does not cite a single case or any other authority to justify the inclusion of these claims.

Accordingly, plaintiffs' claims in Count XV against the doctors could not survive a motion to dismiss and thus leave to amend to include them must be denied.

III.   CONCLUSION

For the foregoing reasons, plaintiffs's motion to amend their complaint (Docket # 316) is granted in part and denied in part.  Plaintiffs are permitted to amend their second amended complaint in accordance with their proposal provided the following claims are excluded:

(1) all claims against NYMC;

(2) § 1983 claims for unconstitutional conditions of confinement against Feaster, Vega, Tina Smith, Christopher Smith, Calvin Smith, Folkes, Muller, Santos, Kenney, Phillips, Quast, Yancy, Poggi, Bourhill, Tony Freeman (Count VII);

(3) all claims against defendants for violation the RLUIPA, 42 U.S.C. § 2000cc-1 (Count

VI);

(4) all claims of § 1985 conspiracy to violate Dilworth's § 1981 rights (Count XIII);

(5) all claims of § 1983 conspiracy to violate Dilworth's First Amendment rights (Count

X);

(6) § 1983 claims of intentional race discrimination against Wyatt and SanMarco (Count

VIII);

(7) § 1983 claims for loss of consortium (Count XVIII); and

(8) claims of "negligence, medical negligence, gross negligence, and negligent and

intentional infliction of emotional distress" against Drs. Goldberg, Bailey-Wallace, and

Schramm (Count XV).

SO ORDERED.

Dated: September 13, 2012
       New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

66